**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**COVINGTON DIVISION**

| | | |
|---|---|---|
| **JOHN ANTONY,** | ) | **Case No: 2:18-cv-00205-DLB-CJS** |
| | : | |
| **Plaintiff,** | ) | **Judge David L. Bunning** |
| | : | |
| **vs.** | ) | **Magistrate Judge Candace J. Smith** |
| | : | |
| **BUENA VISTA BOOKS, INC.** | ) | |
| | : | |
| **Defendant.** | ) | |

<u>**BRIEF IN SUPPORT OF MOTION OF DEFENDANT BUENA VISTA BOOKS, INC. TO**</u>
<u>**EXCLUDE TESTIMONY OF PROFFERED EXPERT CEDAR BOSCHAN**</u>

**REDACTED – FILED ON PUBLIC DOCKET**

# **TABLE OF CONTENTS**

I. INTRODUCTION ................................................................................................................. 1

II. BACKGROUND ................................................................................................................ 3

   A. Ms. Boschan's Experience and Engagement as an Expert by Plaintiff ........................... 3

   B. Relevant Legal Principles ................................................................................................ 7

III. ARGUMENT ..................................................................................................................... 9

   A. Ms. Boschan's Opinions Regarding "Actual Damages" Under Section 504(b) Should Be Excluded ............................................................................................................................ 10

      1. Ms. Boschan's Opinion Regarding Damages From a Hypothetical Film Agreement, Tied to a Claim Not Asserted in This Litigation, Is Irrelevant and Should be Excluded ..... 10

      2. Ms. Boschan's Opinion Regarding Publishing Advances Should Be Excluded as Irrelevant and Unreliable ................................................................................................... 11

   B. Ms. Boschan's Opinion Regarding Defendant's Profits Attributable to Infringement Is Based on Incomplete Data and Analysis, and Is Thus Neither Helpful Nor Reliable .............. 16

   C. Ms. Boschan's Opinion Regarding Calculation of Pre-Judgment Interest Is Also Riddled with Legal and Factual Flaws and Should Be Excluded ....................................................... 19

IV. CONCLUSION ................................................................................................................. 20

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Abu-Lughod v. Suhail Calis*,
    2015 WL 12731921 (C.D. Cal. July 1, 2015) .......................................................3

*AEP Memco, LLC v. Wepfer Marine, Inc.*,
    2006 WL 2846374 (W.D. Tenn. Sept. 30, 2006) ............................................18

*Ask Chemicals, LP v. Computer Packages, Inc.*,
    593 F. App'x 506 (6th Cir. 2014) ......................................................................16

*Aung v. State Farm Fire & Cas. Co.*,
    2020 WL 2089823 (E.D. Ky. Apr. 30, 2020) ...................................................18

*Balsley v. LFP, Inc.*,
    691 F.3d 747 (6th Cir. 2012) ................................................................................8

*Bell v. Taylor*,
    827 F.3d 699 (7th Cir. 2016) ..........................................................................8, 12

*Best v. Lowe's Home Ctrs., Inc.*,
    563 F.3d 171 (6th Cir. 2009) ................................................................................9

*Burgett v. Troy-Bilt LLC*,
    579 F. App'x 372 (6th Cir. 2014) ......................................................................12

*Chen v. Yellen*,
    2021 WL 4192078 (N.D. Ill. Sept. 15, 2021) ...................................................16

*Dash v. Mayweather*,
    731 F.3d 303 (4th Cir. 2013) ..........................................................................7, 12

*Daubert v. Merrell Dow Pharm., Inc.*,
    509 U.S. 579 (1993) ..............................................................................................9

*Daubert v. Merrell Dow Pharms., Inc.*,
    43 F.3d 1311 (9th Cir. 1995) ..............................................................................13

*Ford v. Uniroyal Pension Plan*,
    154 F.3d 613 (6th Cir. 1998) ..............................................................................19

*Gen. Elec. Co. v. Joiner*,
    522 U.S. 136 (1997) ..............................................................................................9

*Greenwell v. Boatwright*,
    184 F.3d 492 (6th Cir. 1999) ..............................................................................15

*Kumho Tire Co., Ltd. v. Carmichael,*
    526 U.S. 137 (1999)........................................................................................9

*Moussouris v. Microsoft Corp.,*
    311 F. Supp. 3d 1223 (W.D. Wash. 2018)..........................................................16

*Newell Rubbermaid, Inc. v. Raymond Corp.,*
    676 F.3d 521 (6th Cir. 2012) ...........................................................................9

*Scott v. Deerbrook Ins. Co.,*
    714 F. Supp. 2d 670 (E.D. Ky. 2010) ..........................................................13, 19

*Smith v. Ill. Dep't of Transp.,*
    936 F.3d 554 (7th Cir. 2019) .........................................................................17

*Tamraz v. Lincoln Elec. Co.,*
    620 F.3d 665 (6th Cir. 2010) .......................................................................9, 13

*Thoroughbred Software Int'l, Inc. v. Dice Corp.,*
    488 F.3d 352 (6th Cir. 2007) ...........................................................................8

*U.S. Commodity Futures Trading Comm'n v. Moncada,*
    2014 WL 2945793 (S.D.N.Y. June 30, 2014) ...................................................17

*United States v. Lang,*
    717 F. App'x 523 (6th Cir. 2017) ...................................................................16

*United States v. Mikos,*
    2003 WL 22922197 (N.D. Ill. Dec. 9, 2003)....................................................14

*United States v. Moody,*
    787 F. App'x 857 (6th Cir. 2019) ...............................................................11, 14

*United States v. Rushing,*
    388 F.3d 1153 (8th Cir. 2004) .......................................................................15

*Wing v. Layton,*
    957 F. Supp. 2d 1307 (D. Utah 2013)..............................................................17

*Wrench LLC v. Taco Bell Corp.,*
    256 F.3d 446 (6th Cir. 2001) ...........................................................................7

**FEDERAL STATUTES**

17 U.S.C. § 504.....................................................................................1, 8, 11

17 U.S.C. § 504(b).................................................................................7, 8, 9

28 U.S.C. § 1961.................................................................................18, 19

**RULES - FEDERAL**

Fed. R. Evid. 702 ...................................................................................................1, 9, 10, 18

**OTHER AUTHORITIES**

5 Nimmer on Copyright § 14.03 (2023) .........................................................................8

5 Nimmer on Copyright § 14.05[G][1] (2023) ..............................................................8

# I.    INTRODUCTION

Plaintiff John Antony offers the expert testimony of Cedar Boschan to support his claim for copyright damages under 17 U.S.C. § 504 in the form of hypothetical licensing fees for his works—what Ms. Boschan labels "actual damages"—and disgorgement of Defendant Buena Vista Books' ("Buena Vista" or "Defendant")[1] profits attributable to the alleged infringement of his works by *The Zodiac Legacy* book series. The Court should exclude Ms. Boschan's opinions under Federal Rule of Evidence 702 as irrelevant, unreliable, and unhelpful.

Ms. Boschan's damages opinion includes the value of a hypothetical breach of implied contract claim against a film company—not Defendant, a book publisher—that Plaintiff did not even raise in his Complaint. At her deposition, she acknowledged that the non-existent claim and the related damages number seemed inapplicable in an accounting of Buena Vista's potential liability, but she nonetheless left it in her report because, in her words, "nobody asked me to take it out."[2] That opinion should be excluded as irrelevant.

Her other opinions are so lacking in factual or methodological support, and so wildly speculative, that they cannot pass muster under *Daubert* or Federal Rule of Evidence 702. Plaintiff's counsel provided Ms. Boschan with a haphazard selection of documents containing incomplete financial information regarding sales of *The Zodiac Legacy*—and failed to provide any of the actually relevant evidence produced in this case by Buena Vista and third parties with financial stakes in the book series, such as Stan Lee's production company, POW! Entertainment ("POW!") and Stuart Moore, the independent contractor who wrote *The Zodiac Legacy* series.

---

[1] Disney Press, an imprint of Disney Book Group, published *The Zodiac Legacy*; Disney Book Group's assets were transferred to Buena Vista in a corporate restructuring. *See* R. 45. For ease of reference, this Motion refers to all three entities as Buena Vista.

[2] Decl. of Usha C. Vance in Support of Mots. for Summ. J. & to Exclude Testimony of Proffered Expert Cedar Boschan ("Vance Decl."), Ex. O (Boschan Dep.) 241:16-243:1. All exhibits cited in this Motion were concurrently filed as exhibits to the Vance Declaration.

Ms. Boschan found the documents she received from counsel so severely lacking in necessary detail that she turned to unfounded assumptions and extrapolations. For instance, she lamented that she had not been provided a single agreement or royalty statement relating to *The Zodiac Legacy*, and was under the impression that none had been produced; these documents would be critical, in her opinion, to quantifying costs incurred by Buena Vista in producing *The Zodiac Legacy* that would need to be deducted from its revenues to arrive at a reliable profit number. Yet, examples of *these very documents* were marked as exhibits in depositions; she just did not review them.

Plaintiff's damages expert did not even review the document that Buena Vista expressly identified in interrogatory responses as reflecting all revenues, costs, and expenses incurred in connection with *The Zodiac Legacy*—a document that covers numerous categories of information that she assumed were "missing" from the evidentiary record. This document shows that, after considering the cost of manufacturing and distributing the books—and the cost of marketing and advertising them as a Stan Lee creation—*The Zodiac Legacy* did not turn a profit.

Ms. Boschan also acknowledges that *The Zodiac Legacy*'s sales would have been driven, in part, by Buena Vista's Stan Lee-branded marketing campaign, and that such sales could not be claimed as copyright damages because they would not be attributable to the alleged infringing use of Plaintiff's work. But her calculation of Plaintiff's copyright damages does not attempt to apportion profits. As a result, her damages opinion gives Plaintiff the benefit of sales of *The Zodiac Legacy* that admittedly have nothing to do with alleged infringement.

Ms. Boschan's willingness to offer an expert opinion based on incomplete information and unsupportable methodologies led another court to exclude her testimony in its entirety; the Court should do the same here.

## II.  BACKGROUND

### A.  Ms. Boschan's Experience and Engagement as an Expert by Plaintiff

Ms. Boschan has an undergraduate degree in "Music Industry" and has taught royalty accounting classes at the Los Angeles College of Music.  (Ex. 207 (CV); Boschan Dep. 143:12-16.)  But she has no undergraduate degree in accounting and no graduate degree—in accounting or otherwise.  (*Id.* at 126:8-11; 129:18-25.)  She is not a Certified Public Accountant.  (*Id.*)  She has served as an expert relating to the music, film and television, and video games industries, and has worked at litigation support firms as a forensic accountant.  (*Id.* at 130:24-140:17.)  Although she suggested at her deposition that she has been engaged previously as an expert on book publishing, she declined to identify a single relevant matter, citing confidentiality concerns.[3]  She has never worked for a book publisher, book distributor, or book editor, or negotiated a publishing contract; she has never been or worked for a literary agent.  (*Id.* at 142:15-143:7; 148:22-149:2.)  She claims expertise in book publishing licensing practices based on seeing "hundreds" of book license deals.  But she refused to identify a single one of them.  (*Id.* at 150:2-22.)

Ms. Boschan's willingness to offer expert accounting opinions based on incomplete information led the court in *Abu-Lughod v. Suhail Calis*, 2015 WL 12731921 (C.D. Cal. July 1, 2015), to exclude her testimony on the value of services provided by her client.  There, Ms. Boschan claimed that "the population of data was too voluminous to review all of it," a claim the court found "dubious."  *Id.* at *4.  The court detailed its misgivings with Ms. Boschan's proffered opinion, stating that Ms. Boschan "does not satisfactorily explain why she tested only a portion of the time entries, vendor invoices, and bank records (5% of the time entries, 19% of the vendor invoices, and 29% of the bank records) instead of examining all of them."  *Id.*  Because

---

[3] *Id.* at 16:10-17:12; 33:4-34:10; 35:12-36:25; 37:8-16; 137:22-139:14.

Ms. Boschan "fail[ed] to articulate a basis for her methodology and, even more troubling, her failure to use a random sampling," the court excluded her entire opinion. *Id.* Ms. Boschan has never reviewed the court's order, and does not think she would know whether her testimony has been excluded in other cases or arbitrations because "nobody ever calls [her] to tell [her]" what "happens after [she] testif[ies]." (Boschan Dep. at 152:21-153:17, 157:13-158:17.)

Here, Ms. Boschan relied on just five documents produced by Buena Vista to reach her financial conclusions.[4] She did not review any documents produced by third parties who had a financial stake in *The Zodiac Legacy*'s success and received royalty payments, namely Stan Lee's POW! (which produced nearly 7,500 pages) or Stuart Moore, the independent contractor who wrote the series (and produced nearly 9,500 pages).[5] Nor was she provided the accounting reports that Buena Vista produced from its corporate database systems. (Boschan Dep. 59:15-17, 64:16-65:23.) She complained that the five documents that she relied on were attachments to emails or meeting agendas produced by Buena Vista; "[t]here weren't any actual reports from a financial or a logistics or a sales system." (*Id.*)

Ms. Boschan's report identifies 20 different ways in which her opinions were subject to "limitations" imposed by the dearth of information in the documents she reviewed; she identified them to Plaintiff's counsel, who gave her another set of documents which she did not find useful. (*Id.* at 57:13-60:14, 63:6-17, 93:2-22.) Her report specifies that if she were to receive any of the purportedly "missing" information, "an adjustment to the expert's findings and opinions may be warranted." (*Id.* at 165:1-18; Ex. 205 at 3-4 (list of 20 "Limitations" relating to "missing documents").)

---

[4] *See* Ex. 205 at 15 ("Documents Relied On By Expert").
[5] Vance Decl. ¶ 5; Boschan Dep. 86:21-87:11.

Some of the purportedly "missing" documents had previously been designated as deposition exhibits. Ms. Boschan says she reviewed both the deposition transcripts provided to her and their exhibits, but she admitted that she was not provided *The Zodiac Legacy* author Stuart Moore's deposition transcript. (Boschan Dep. 70:15-71:9 (confirming she did not receive it from Plaintiff's counsel); Ex. 205 at 15 (listing "Documents Relied On By Expert").) Item #2 on Ms. Boschan's "Limitations" list complained about the lack of "agreements between Stuart Moore or his affiliates & the Defendant or its affiliates." (Ex. 205 at 3.) Yet all three agreements between Buena Vista and Mr. Moore regarding *The Zodiac Legacy* novel series were marked as exhibits at Mr. Moore's deposition.[6] Also marked as exhibits were agreements relating to two promotional "e-books" that were released before the book series.[7]

The deposition transcript for POW!'s office administrator, Kim Luperi, likewise does not appear on the list of documents that Ms. Boschan relied upon. (Ex. 205 at 15.) Had Plaintiff's counsel provided her with Ms. Luperi's deposition transcript, she could have crossed off a few more items from her list of analytical "Limitations" based on purported "missing documents." (*Id.* at 3.) For instance, introduced at Ms. Luperi's deposition was a royalty statement for Stan Lee relating to *The Zodiac Legacy*, which POW! had produced;[8] Item #5 on Ms. Boschan's "Limitations" list asked for "accountings to Stan Lee or his affiliates from the Defendant and its affiliates." (Ex. 205 at 3.) Ms. Luperi's deposition also covered a variety of documents produced by POW! detailing Stan Lee's marketing and promotional activities as part of his

---

[6] Ex. 50 (Oct. 2013 agreement – Book 1 "tentatively entitled THE ZODIAC"); Ex. 51 (Sept. 2015 agreement – Book 2 "tentatively entitled THE ZODIAC LEGACY: THE DRAGON'S RETURN"); Ex. 52 (Feb. 2016 agreement – Book 3 "tentatively entitled THE ZODIAC LEGACY: BALANCE OF POWER").

[7] Ex. 54 (Feb. 2014 – "E-Book Preview 1"); Ex. 53 (Mar. 2014 agreement – "E-Book Preview 2").

[8] Ex. 155.

commitment to promoting *The Zodiac Legacy* series;[9] these summaries would have helped satisfy Item #20 on Ms. Boschan's "Limitations" list, relating to "marketing and product/exploitation plans for the Defendant's Zodiac brand." (Ex. 205 at 4.)

Ms. Boschan was not provided any marketing-related information produced by Buena Vista—whether in the form of Buena Vista's official marketing plans for each title, or in the form of cost documentation, such as the granular accounting spreadsheets listing marketing expenses, invoice notes, and media and advertising expenditures that Ms. Boschan saw for the first time during her deposition. (*See* Ex. 210; Boschan Dep. 314:14-318:4.)

Notably, Ms. Boschan also did not receive a spreadsheet that Buena Vista expressly identified in interrogatory responses as reflecting "the revenues received, and costs and expenses incurred (excluding overhead costs), in connection with Defendant's Work."[10] She thus did not consider it in rendering her opinion. (Boschan Dep. 163:1-164:25.) Ms. Boschan is also at fault for dropping the ball, though, because she believes she reviewed Buena Vista's interrogatory responses but failed to ask Plaintiff's counsel for the document the responses referenced by Bates number. (*Id.* at 163:24-165:7.) Had Plaintiff's counsel provided Ms. Boschan with a copy of this multi-tabbed accounting spreadsheet, she would have received purportedly missing information relating to Buena Vista's domestic gross sales and net profits (Item #13 on her "Limitations" list), allocations to revenues and charges (Item #11), the fiscal and territorial coverage of its records (Item #14), and revenues from online retailers, licensing, and audible exploitations (Item #15).[11] The spreadsheet details various categories of costs Buena Vista incurred in manufacturing and selling *The Zodiac Legacy*—such as cost of goods sold (COGS),

---

[9] *See, e.g.*, Exs. 141-154; Ex. L (Luperi Dep.) 114:7-115:19; 120:11-149:4 (discussing Stan Lee-focused marketing campaign, promotional events, media appearances for *The Zodiac Legacy*).
[10] *See* Ex. 208, at Interrogatory No. 19 & Response (directing Plaintiff to BV-00016644).
[11] *Compare* Ex. P (BV-00016644) *with* Ex. 205 at 3-4.

the cost of distribution, product development costs, earned royalties, and of course marketing and advertising costs—which Ms. Boschan agreed were examples of costs which would be properly deducted from any revenues to determine profits. (*Id.* at 218:8-219:9; 225:16-230:16.) These "direct" costs are in addition to necessary "indirect" costs, such as the salaries of Buena Vista's book editor, its in-house marketing team, and its in-house accounting team. (*Id.* at 227:25-230:16.)

B.    **Relevant Legal Principles**

Under Section 504(b) of the Copyright Act, titled "Actual Damages and Profits," a prevailing plaintiff is "entitled to recover [1] the actual damages suffered by him or her as a result of the infringement, and [2] any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages." 17 U.S.C. § 504(b).

Plaintiff seeks to use Ms. Boschan's opinion to establish the "value of what a reasonable arm's-length negotiated license would have been between Antony and Defendant," and does not contend that he suffered any out-of-pocket losses as actual damages. (Exs. 202, 203 at 7-8; Boschan Dep. 46:15-48:15.)

To establish the second category of damages under Section 504(b), profits attributable to the infringement, Plaintiff engaged Ms. Boschan to opine on the "value of Defendant's revenues generated by exploitation of Plaintiff's Work" and "[a]ny of Defendant's Proven Costs." (Ex. 202.)

Ms. Boschan also opines on potential pre-judgment interest due on the amounts she calculates as actual damages and profits attributable to the infringement.

***Actual Damages:*** Ms. Boschan's opinion on the "value of what a reasonable arms-length negotiated license would have been between Antony and Defendant" appears to equate "actual

damages" under Section 504(b) with a hypothetical negotiated license fee paid by Buena Vista, even though Plaintiff and Buena Vista have no negotiation history. While some circuits have adopted this approach to quantifying damages,[12] the Sixth Circuit has not. *See Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 457 (6th Cir. 2001) ("The remedies available under copyright law do not include damages for the reasonable value of the defendants' use of the work."); *id.* at 457 n.5 (noting hypothetical license "issue is discussed at length" in prior edition of *Nimmer on Copyright*).[13] This is consistent with the leading copyright treatise, which rejects the proposition that the Copyright Act authorizes an award of hypothetical license fees as inconsistent with the statutory text and history. *See* 5 *Nimmer on Copyright* § 14.05[G][1] (2023) ("The painstaking analysis set forth above leads to only one conclusion—the current Copyright Act does not authorize an award of hypothetical royalties."); *id.* § 14.05[D][1] (concluding "the Sixth Circuit aligns with the Second" in rejecting "the implied license fee").

Even in circuits that permit the use of a hypothetical negotiation to arrive at a reasonable licensing fee, courts have required evidence to support the claimed "fair market value" of a plaintiff's work. For example, the Seventh Circuit affirmed the denial of $200 in claimed lost license fees to a photographer as a form of "actual damages" under the Copyright Act because he did not provide evidence "that he has ever actually had a buyer willing to pay $200 for his photo." *Bell v. Taylor*, 827 F.3d 699, 709 (7th Cir. 2016). Plaintiff is in the same bind under that reasoning: He has no evidence that he has ever sold or licensed a screenplay, or any literary work, nor does he claim to have done so.

---

[12] *See, e.g., Dash v. Mayweather*, 731 F.3d 303, 312 (4th Cir. 2013) (explaining that a "cognizable measure" of actual damages is "the fair market value of the licensing fee the owner was entitled to charge for the infringer's use of his copyrighted work").

[13] *Cf. Thoroughbred Software Int'l, Inc. v. Dice Corp.,* 488 F.3d 352, 359-60 (6th Cir. 2007) (awarding lost license fees based on a pre-existing "Dealer Agreement" between the parties).

*Profits Attributable to Infringement:* The Copyright Act also permits plaintiffs to seek damages in the form of disgorgement of the defendant's profits "that are attributable to the infringement." 17 U.S.C. § 504(b). Section 504 provides that the copyright owner bears the initial burden to present evidence of "the infringer's gross revenue." But courts generally require a "causal" relationship between the infringement and the defendant's revenue. *See* 5 Nimmer on Copyright § 14.03 (2023). The Sixth Circuit has explained: "this gross revenue number must have a reasonable relationship—relevance, in other words—to the infringing activity." *Balsley v. LFP, Inc.*, 691 F.3d 747, 769 (6th Cir. 2012).

## III.  <u>ARGUMENT</u>

Before admitting expert testimony into evidence, the district court must perform a "gatekeeping role" of ensuring that the testimony is both "relevant" and "reliable" under Rule 702. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993). To be relevant, the Court must determine that the expert testimony "will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). "*Daubert* [also] adds that the gatekeeping inquiry must be 'tied to the facts' of a particular 'case.'" *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999).

To be admissible, expert testimony must also be based on "sufficient facts or data" and must be "the product of reliable principles and methods" that have been "reliably applied … to the facts of the case." Fed. R. Evid. 702(b), (c). The Sixth Circuit has identified "[r]ed flags that caution against certifying an expert"—"reliance on anecdotal evidence, improper extrapolation, failure to consider other possible causes, lack of testing, and subjectivity." *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012) (citing *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 177 (6th Cir. 2009)). In sum, the "'*ipse dixit* of the expert' alone is not

sufficient to permit the admission of an opinion." *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 671 (6th Cir. 2010) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

Each of Ms. Boschan's opinions suffers from one (or more) of these fundamental flaws, and must be excluded under Rule 702.

### A.   Ms. Boschan's Opinions Regarding "Actual Damages" Under Section 504(b) Should Be Excluded.

As for the "actual damages" purportedly owed to Plaintiff, Ms. Boschan states that "[b]ut for the failure of Defendant to license from Antony the work(s) it exploited, Antony would have received reasonable compensation for such exploitation." (Ex. 203 at 7.) Ms. Boschan opines that Plaintiff would be entitled to *two* hypothetical license agreements: first, a film option and purchase agreement valued at $8,073; and second, a number of "book deal[s]" with advance payments valued at ███████. (*Id.*) Neither of these opinions pass muster under Rule 702.

### 1.   Ms. Boschan's Opinion Regarding Damages From a Hypothetical Film Agreement, Tied to a Claim Not Asserted in This Litigation, Is Irrelevant and Should be Excluded.

Ms. Boschan opines that, because "primary exploitation of Antony's works was originally intended as a feature film franchise," "it is implied that the first agreement with Antony should have been an option and purchase agreement on terms no less favorable than the minimums required of big-budget studios by the Writers' Guild of America (WGA)." (Ex. 203 at 7.) She values that film option and purchase agreement at $8,073. (*Id.*) Ms. Boschan's opinion on this point is irrelevant, as it is tied to her assumption that there was an implied contract between Plaintiff and a film company, which would be the counterparty to this hypothetical film agreement, not Defendant Buena Vista Books. (*Id.* at 5, § III(c); Boschan Dep. 83:2-5; 99:24-100:25; 238:12-240:20.) Ms. Boschan even understands that "Antony's works have not yet been exploited in photoplay format," (Ex. 203 at 7), such that this category of damages has no connection to the alleged infringement by Buena Vista.

Before finalizing her opinion in this matter, Ms. Boschan noticed that there was no claim in this case against Buena Vista for breach of an implied contract; she also conceded that if there was no implied contract claim, then the "amount that we've quantified as damages"—the $8,073 figure for the film deal—"would not be applicable." (Boschan Dep. 99:24-100:25; 81:7-25.) When asked why she nonetheless included the value of a film option and purchase agreement as a category of damages that *Buena Vista* would be liable for, Ms. Boschan replied, "I think that that is a fair question. And it's actually a question that I—I have." (*Id.* at 240:16-241:2.) She attributed the inclusion of this hypothetical deal with a film company in the damages she calculated against Buena Vista to her own misunderstanding: her initial thinking was that there was an issue relating to an "implied contract for the film deal," so she calculated those damages; when later she realized that "Buena Vista Books was the only defendant" she thought to herself "I don't know that it makes sense to include this." (*Id.* at 241:16-243:1.) She kept it in her report because "nobody asked me to take it out." (*Id.*)

Ms. Boschan's opinion regarding the value of a film option and purchase contract between Plaintiff and some film entity—*not* the book publisher defendant in this case—based on an unasserted implied contract claim is self-evidently irrelevant to calculating copyright damages against Buena Vista. Because Ms. Boschan's proposed testimony on this point would "not address '[t]he particular issue in this case,'" it is "inadmissible" and should be excluded. *United States v. Moody*, 787 F. App'x 857, 863 (6th Cir. 2019).

> **2.** **Ms. Boschan's Opinion Regarding Publishing Advances Should Be Excluded as Irrelevant and Unreliable.**

Separate from the film option and purchase contract, Ms. Boschan opines that Buena Vista "was obliged to secure a separate agreement with Antony to cover its literary and any other uses of his work. [She] estimated based on [her] experience the up-front payments one could reasonably expect a willing licensee to pay" as a minimum of ███, comprising advance

payments of ▮▮▮▮ for each of the three novels in *The Zodiac Legacy* series, and advance

payments of ▮▮▮▮ apiece for the two promotional e-books released by Buena Vista and the

three comic books published by third-party licensor Papercutz.  (Ex. 203 at 7; Ex. 205 at 7

("Plaintiff Actual Damages: Book Publishing").)  Ms. Boschan's opinion suffers from a number

of defects, which warrant its exclusion.

      *First*, the Sixth Circuit does not authorize the substitution of a hypothetical reasonable

licensing fee in place of actual damages under Section 504 for a copyright plaintiff who has not

actually engaged in negotiations with the alleged infringer.  (*See supra,* § II.B.)  And, even if this

Court were to follow out-of-circuit case law adopting such an approach, Ms. Boschan admits that

she has no evidence that Plaintiff has ever successfully sold a screenplay (Boschan Dep. 74:8-

11), and thus no evidence "that he has ever actually had a buyer willing to pay" to license his

works, *Bell*, 827 F.3d at 709.

      The Fourth Circuit's decision in *Dash v. Mayweather*, 731 F.3d 303 (4th Cir. 2013), is

instructive.  Dash was an unknown music creator who had never received any revenue from his

work; he created a musical track that the boxer Floyd Mayweather, Jr. used without permission.

*Id.* at 307-08.  Although the court embraced the lost license fee theory, it denied recovery

because the plaintiff had no evidence that he had ever been compensated for his music in the

past.  *Id.* at 317-18, 325.  The plaintiff's expert attempted to use the defendants' licensing

agreements with other parties as "benchmarks" to determine the hypothetical value of a license

for the plaintiff's work—but those agreements involved well-known artists such as the Red Hot

Chili Peppers and Snoop Dogg.  *Id.* at 315, 320.  Their works could not serve as reasonable

comparables and could not support an award of actual damages without "undue speculation."  *Id.*

at 320.  Thus, even under out-of-circuit case law allowing hypothetical licensing fees under

certain circumstances, this category of damages is unavailable to Plaintiff, and Ms. Boschan's opinion on this topic should be excluded as irrelevant.

*Second*, Ms. Boschan did not reference a single license agreement in arriving at her estimate of what a "reasonable" advance payment would be for Plaintiff. (Boschan Dep. 246:16-247:15.) She did not consult any treatises or any literary agents. (*Id.* at 249:19-250:5.) Instead, she relied exclusively on her "experience." (Ex. 203 at 7 ("I have estimated based on my experience the up-front payments one could reasonably expect a willing licensee to pay in consideration for the rights to publish the books that infringe on Antony's work.").) The Sixth Circuit has cautioned that courts do "not consider 'the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question.'" *Burgett v. Troy-Bilt LLC*, 579 F. App'x 372, 376 (6th Cir. 2014). Here, Ms. Boschan has no relevant publishing experience. (*See supra* § II.A.)

Experts who rely "primarily on experience" must explain "[1] how that experience leads to the conclusion reached, [2] why that experience is a sufficient basis for the opinion, and [3] how that experience is reliably applied to the facts." Fed. R. Evid. 702, Advisory Comm. Notes, 2000 Amends. To satisfy this test, an expert "must do more than aver conclusorily that h[er] experience led to h[er] opinion." *Scott v. Deerbrook Ins. Co.*, 714 F. Supp. 2d 670, 674 (E.D. Ky. 2010) (excluding expert opinion on reasonable jury award for personal injury case where expert failed to explain how his review of the "case file and his own experiences with insurance cases led him to those values"). Ms. Boschan's unspecified "experience" fails to answer any of those three questions: neither her written report nor her deposition testimony addresses (1) *how* her experience led to the values she assigned to advance payments for eight different works (a problem caused in no small part by her refusal to identify a single book deal that she had

previously seen), (2) *why* her experience is sufficient to confidently assert those valuations, and (3) *how* her experience provides a reliable foundation for her testimony.

Ms. Boschan does not even know the literary format of some of the allegedly infringing products that she uses to calculate damages. She cannot describe what they are, except that the e-books are not "complete" books and that the remaining titles (comic books) "aren't the big products" and "based on like the research [she] did on Amazon, they seemed similar to the" e-books. (Boschan Dep. 251:21-252:19; 256:24-257:9; 259:13-24.) Until her deposition, she was not aware that the e-books, which were released before the first book, were created for purposes of marketing the book series. (*Id.*) In these circumstances especially, "the '*ipse dixit* of the expert' alone is not sufficient to permit the admission of an opinion." *Tamraz*, 620 F.3d at 671.

In addition to "explain[ing] the methodology the experts followed to reach their conclusions," the expert must "point to any external source to validate that methodology." *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1319 (9th Cir. 1995). Ms. Boschan attempts to validate her opinion by citing a writing coach's blog, but this only highlights the unreliability of her damages figures. She does not claim that the blogger has expertise in the area of book advances, and she has no clue how the blogger collected, validated, or analyzed survey responses purportedly provided by authors regarding their book advances. (Boschan Dep. 264:3-270:22; Ex. 209.) Instead, she conceded, "I don't have great answers as far as what her exact approach was. And I would assume that it's—that it's flawed or biased. It's just the only information out there, you know." (*Id.* at 268:18-269:20.) She offered only one concrete detail regarding the blogger's survey response data: that it covers book advances paid between 2016 and 2021, years after the relevant dates in this litigation. (*Id.* 272:7-25.) The blogger's survey

results would not past muster on their own,[14] and Ms. Boschan's opinion regarding advance payments for illustrated novels, e-book previews, and comic books is not based on sufficient facts or a reliable methodology and should be excluded.[15]  Her ability to google "book advances" and identify an unreliable blog post does not make her an expert with a helpful opinion.

*Third*, the actual evidence contradicts the assumptions underlying Ms. Boschan's opinion regarding reasonable advance payments for *The Zodiac Legacy* books, promotional e-books, and comic books.  Ms. Boschan assumes that any advances Plaintiff might have received would have been eclipsed many times over by the advances paid to the legendary Stan Lee or Stuart Moore. Indeed, Ms. Boschan acknowledged that "Stan Lee is not really the same as anybody else from a negotiation standpoint," and that she would expect him to have "significantly more leverage or negotiating power than someone like John Antony who had never sold a screenplay."  (Boschan Dep. 169:22-170:24; 172:13-175:15.)

Likewise, Stuart Moore is a well-known author of comic books and a line of prose novels from Marvel Comics[16]; Ms. Boschan agreed that Mr. Moore's reputation and prior writing history would be relevant to the advance he commanded, which she assumed would be higher than the advance she estimated for Plaintiff.  (Boschan Dep. 179:24-181:20.)  However, she opines that the unknown Antony would have negotiated an advance for the first book of ████████—*more than twice* what Stuart Moore was paid.  Mr. Moore was advanced a total of

---

[14]  *See, e.g.*, *United States v. Mikos*, 2003 WL 22922197, at *4 (N.D. Ill. Dec. 9, 2003) (finding that FBI database of bullet samples could not be the basis for expert testimony; database could not satisfy *Daubert* requirements where there was no evidence "that the samples were gathered in any approved scientific manner so as to be considered as representative of the bullet population as a whole").

[15] *See Moody*, 787 F. App'x at 862-63 ("[T]here is no indication in the record that [the expert] read those contracts or knew the details of the business.  No matter how good an accountant he is, [his] opinion would not have been 'based on sufficient facts or data,' so it was inadmissible.").

[16] *See* Ex. J (Marsham Dep. 46:4-49:18); Ex. K (Voccola Dep.) 119:10-121:8; Ex. I (Moore Dep.) 19:21-20:16, 25:25-26:8, 46:23-47:8, 57:13-58:3, 66:23-25.

▮▮▮, paid in installments, with the second half due only after he delivered the completed, 500-page book.  (*See* Ex. 50 at § 4(a).)  What is more, Ms. Boschan conceded that Mr. Moore's advance was not a valid comparable, in part because it would have accounted for "all of the painstaking work that goes into creating a 500-page book," which she assumed Plaintiff would not have been hired to do.  (Boschan Dep. 260:8-261:8.)

Ms. Boschan opines that, for the second and third books, Plaintiff would again have received advances of ▮▮▮ apiece (Ex. 205 at 7); yet Moore wrote another 1,000 pages in exchange for advances of ▮▮▮ per book.[17]  Expert testimony such as Ms. Boschan's "is inadmissible when the facts upon which the expert bases his testimony contradict the evidence." *Greenwell v. Boatwright*, 184 F.3d 492, 497 (6th Cir. 1999); *United States v. Rushing*, 388 F.3d 1153, 1156 (8th Cir. 2004) ("Expert testimony should not be admitted when it is speculative, it is not supported by sufficient facts, or the facts of the case contradict or otherwise render the opinion unreasonable").  The evidence of what Mr. Moore was *actually* paid for his considerable work on *The Zodiac Legacy* series shows that Ms. Boschan's assumptions are flat-out wrong, and renders her opinion regarding advance payments due to Plaintiff unreasonable, unreliable, and inadmissible.

**B.**      **Ms. Boschan's Opinion Regarding Defendant's Profits Attributable to Infringement Is Based on Incomplete Data and Analysis, and Is Thus Neither Helpful Nor Reliable.**

"Relevant expert testimony is admissible only if an expert knows of facts which enable him to express a reasonably accurate conclusion," and "[o]pinions that are derived from erroneous or incomplete data are appropriately excluded." *Moussouris v. Microsoft Corp.*, 311 F. Supp. 3d 1223, 1244 (W.D. Wash. 2018).  Indeed, "cherry-picking data is just as bad as omitting it or making it up altogether." *United States v. Lang*, 717 F. App'x 523, 536 (6th Cir.

---

[17] Ex. 51; Ex. 52.

2017).  Ms. Boschan's attempt at calculating Buena Vista's profits attributable to alleged

infringing uses of Plaintiff's works is inherently unreliable, given that she received from

Plaintiff's counsel almost none of the information that she insists would be necessary for an

accurate analysis. "When expert opinions are based on unreliable and incomplete facts, they are

fundamentally flawed." *Chen v. Yellen*, 2021 WL 4192078, at \*4 (N.D. Ill. Sept. 15, 2021).  Ms.

Boschan's opinion cannot be squared with the produced records showing that, after accounting

for direct costs that Ms. Boschan acknowledges must be deducted from *The Zodiac Legacy*'s

revenues, Buena Vista made no profit on the books.[18]

Faced with a similar situation in *Ask Chemicals, LP v. Computer Packages, Inc.*, 593 F.

App'x 506 (6th Cir. 2014), the Sixth Circuit affirmed a district court's decision that an expert

opinion on lost profits based on "fundamentally flawed data and impermissible methods" was

inadmissible.  *Id.* at 510.  The expert had relied on a few scattered documents, supported by

extrapolation, and could not have "demonstrated lost profits to a reasonable certainty."  *Id.*  The

Seventh Circuit likewise held that a district court properly excluded expert testimony that was

"based on an incomplete picture," and "relied only on what appears to be plaintiff-curated

records."  *Smith v. Ill. Dep't of Transp.*, 936 F.3d 554, 558 (7th Cir. 2019); *see also U.S.*

*Commodity Futures Trading Comm'n v. Moncada*, 2014 WL 2945793, at \*3 (S.D.N.Y. June 30,

2014) (excluding expert who "look[ed] at a fraction of the data in his possession and conclude[d]

that [the defendant's] activity had no impact on the market.  Unfortunately, in the absence of any

analysis at all of most of the available data, there is no reliable basis on which the 'expert' could

have reached such a conclusion."); *Wing v. Layton*, 957 F. Supp. 2d 1307, 1314 n.7 (D. Utah

2013) (excluding expert testimony where opinion about profitability of a business was "based on

incomplete data" and therefore "neither helpful nor reliable.").  Here, too, Ms. Boschan admits

---

[18] *See* Ex. P (BV-00016644).

that her opinion is based on incomplete data and that she would change it if given access to documents that Buena Vista produced long before she was retained.  (Boschan Dep. 119:12-120:10; Ex. 203 at 6.)  This opinion is neither reliable nor helpful.

Finally, Ms. Boschan acknowledged that a prevailing copyright plaintiff can only recover a defendant's profits that are attributable to the infringement, and that she did not even try to apportion Buena Vista's (non-existent) profits.  She conceded that a portion of any profits would be attributable to the fact that Buena Vista marketed the books as the work of Stan Lee, since that would clearly drive sales.  (Boschan Dep. 288:2-290:19.)  She noted that she would need to undertake a "study" to determine what portion of the profits were driven by Stan Lee's name, and explained that "if we had gotten complete revenue information and marketing information as just two examples, I think that at some point [doing such a study] would actually make sense for me to do.  But we didn't."  (*Id.* at 289:13-290:4.)  Plaintiff's counsel's failure to provide Ms. Boschan with any of the pertinent documents produced by Buena Vista, POW!, and Stuart Moore, or even with a full set of deposition transcripts, cannot create a loophole that allows Ms. Boschan to revise her opinions with the benefit of understanding the fatal flaws in her analysis.[19]

Likewise, Ms. Boschan did not determine whether other elements of *The Zodiac Legacy* books that are unrelated to the alleged infringement contributed to profits; in her words, "the first place is to get at what the profits are and then to do some analysis of apportionment.  But we are not even there yet."  (Boschan Dep. 291:3-14.)

---

[19] "[C]ourts have routinely rejected attempts to add new analyses, opinions, or theories under the guise of supplementation"; "[t]his is especially true when the information underlying the new opinion was available to the party at the time of her initial disclosure." *Aung v. State Farm Fire & Cas. Co.*, 2020 WL 2089823, at *8 (E.D. Ky. Apr. 30, 2020).

### C. Ms. Boschan's Opinion Regarding the Calculation of Pre-Judgment Interest Is Also Riddled with Legal and Factual Flaws and Should Be Excluded.

Ms. Boschan's final opinion concerns the calculation of pre-judgment interest on the amounts she estimated as Plaintiff's actual damages (those hypothetical licensing deals) and Buena Vista's profits (really, just revenues without any deduction of costs or attempt to apportion). She applies a 12% interest rate because, she says, "[t]here is no rate specified in the Federal code." (Ex. 203 at 8.) That interest rate more than doubles the sum purportedly owed to Plaintiff as damages. (*Id.*; Ex. 205 at 11.) Even if her opinions on Plaintiff's underlying damages were not subject to exclusion under Rule 702—which they are—her opinion regarding the calculation of pre-judgment interest is legally and factually unsupported, and must be excluded as unreliable and unhelpful.

*First*, Ms. Boschan errs in using an eye-watering 12% interest rate for her calculations. The Copyright Act does not expressly provide for pre-judgment interest, and "[a]lthough Congress has enacted a statute governing the award of post-judgment interest in federal court litigation, *see* 28 U.S.C. § 1961, there is no comparable legislation regarding prejudgment interest." *AEP Memco, LLC v. Wepfer Marine, Inc.*, 2006 WL 2846374, at *11 (W.D. Tenn. Sept. 30, 2006). Because "[p]re-judgment interest is not awarded as a penalty," but "merely an element of just compensation," the Sixth Circuit "has held that the post-judgment interest rate contained in 28 U.S.C. § 1961 is a reasonable rate to be applied to awards of pre-judgment interest." *Id.* (citing *Ford v. Uniroyal Pension Plan*, 154 F.3d 613, 619 (6th Cir. 1998)). Section 1961's interest rate, tethered to the "weekly average 1-year constant maturity Treasury yield," is less than 5.5%.[20]

---

[20] *See* https://www.federalreserve.gov/releases/h15/ .

*Second*, Ms. Boschan's start date for the interest calculations has no factual or methodological grounding. Ms. Boschan begins calculating interest on the estimated "actual damages" (the hypothetical film deal with a film company that is not Buena Vista, and advance payments on hypothetical book deals that far eclipse Stuart Moore's actual advances) on dates that she found reasonable based on her "general experience." (Boschan Dep. 293:17-294:15.) Ms. Boschan explained how she applied her "general experience" this way as follows: "Like looking at when [the books] were released on Amazon, I think I assumed that it would have been, you know, between six months and two years before the release or something that is similar to what I've seen in the past. And so that's how." (*Id.* at 293:17-24.) Ms. Boschan "must do more than aver conclusorily that h[er] experience led to h[er] opinion" to avoid having this opinion excluded. *Scott*, 714 F. Supp. 2d at 674. Her *ipse dixit* carries no weight.

*Finally*, the actual evidence (which Ms. Boschan did not consider) contradicts the random dates she selects as the dates she "would expect the advance to have been received," which trigger the accumulation of interest. (Boschan Dep. 294:7-10.) Consider the two promotional e-books: Ms. Boschan assumes the advance payments would have been made on January 1, 2013 based on her "general experience." However, Mr. Moore (who received just a flat fee for the works, which was half of what Ms. Boschan estimates would have been Plaintiff's "advance payment") was paid in two installments that trail Ms. Boschan's estimates by at least a full year. The initial installment was paid to Mr. Moore in February 2014 for the first e-book, and in March 2014 for the second e-book. (Exs. 53, 54 at § 4(a).) Ms. Boschan's opinion regarding interest calculations, which was again rendered without consulting the actual evidence, is unreliable and would not help the trier of fact. It must be excluded.

## IV. <u>CONCLUSION</u>

Buena Vista respectfully requests that the Court exclude Ms. Boschan's opinions

regarding copyright damages.

Respectfully submitted,

/s/ *Robert B. Craig*
Robert B. Craig

Robert B. Craig (15590)
TAFT STETTINIUS & HOLLISTER, LLP
50 East Rivercenter Blvd., Suite 850
Covington, KY 41011
Tel: (859) 547-4300; craigr@taftlaw.com

Glenn D. Pomerantz (*pro hac vice*)
Erin J. Cox (*pro hac vice*)
Usha C. Vance (*pro hac vice*)
Shannon Aminirad (*pro hac vice*)
MUNGER, TOLLES & OLSON LLP
350 S. Grand Avenue, 50th Floor
Los Angeles, CA 90071-3426
Tel: (213) 683-9100;
glenn.pomerantz@mto.com,
erin.cox@mto.com, usha.vance@mto.com;
shannon.aminirad@mto.com

*Counsel for Defendant Buena Vista Books, Inc.*