## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
## COVINGTON DIVISION

| | | |
|---|---|---|
| JOHN ANTONY, | ) | Case No: 2:18-cv-00205-DLB-CJS |
| | : | |
| Plaintiff, | ) | Judge David L. Bunning |
| | : | |
| vs. | ) | Magistrate Judge Candace J. Smith |
| | : | |
| BUENA VISTA BOOKS, INC. | ) | |
| | : | |
| Defendant. | ) | |

## BRIEF IN SUPPORT OF MOTION OF DEFENDANT BUENA VISTA BOOKS, INC. FOR SUMMARY JUDGMENT

## REDACTED – FILED ON PUBLIC DOCKET

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION .................................................................................. 1

II. BACKGROUND ................................................................................ 2

    A. Defendants Independently Created *The Zodiac Legacy* ................................. 2

        1. POW! Entertainment Originates *The Zodiac Legacy*'s Concept .................. 3

        2. Nachie Marsham Transforms POW!'s Concept into a Middle-Grade Book Series ........................................................................... 5

        3. Stuart Moore Authors the Three-Book Series ............................... 6

        4. Buena Vista Markets and Sells *The Zodiac Legacy* .................................. 8

    B. Plaintiff's Works ............................................................................. 8

    C. Plaintiff's Attendance at a 2006 Screenwriting Convention ................................. 10

III. PROCEDURAL HISTORY ............................................................... 12

IV. ARGUMENT ...................................................................................... 13

    A. Plaintiff Lacks a Valid Copyright Registration for the Version of His Works That Buena Vista Allegedly Accessed ........................................ 13

    B. *The Zodiac Legacy* Was Independently Created ................................... 15

    C. There Is No Evidence that Buena Vista—or *The Zodiac Legacy*'s Creators—Accessed Plaintiff's Works ............................................. 17

    D. *The Zodiac Legacy* Is Not Substantially Similar in Protected Expression to Plaintiff's Works ................................................................... 20

        1. Plaintiff's Account of the Similarities Between the Works Is Rife with Misrepresentations ....................................................... 22

        2. The Alleged Similarities Between the Works Are Based on Unprotectable Elements and Must Be Filtered Out ........................... 24

            (a) The Concept of Superheroes with Powers Derived from the Chinese Zodiac Is Not Protectable Expression .......................... 24

            (b) Characteristics Derived from Animals Are Not Protectable Expression ................................................................... 26

            (c) Use of the "Hero's Journey" Plot Is Not Protectable Expression ................................................................... 28

            (d) Common Tropes in the Superhero, Fantasy, and Science Fiction Genres Are Not Protectable Expression ........................... 28

            (e) Generic Themes in Plaintiff's Works Are Not Protectable Expression ................................................................... 30

        3. After Filtration, a Comparison of the Works Reveals No Similarity ......... 31

V. CONCLUSION ................................................................................... 35

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Althouse v. Warner Bros. Ent.*,
   2014 WL 2986939 (C.D. Cal. Apr. 28, 2014) .......................................................... 29

*Basile v. Warner Bros. Ent., Inc.*,
   2016 WL 5867432 (C.D. Cal. Jan. 4, 2016) ...................................................... 25, 28

*Benay v. Warner Bros. Ent., Inc.*,
   607 F.3d 620 (9th Cir. 2010), overruled on other grounds *by Skidmore ex rel.*
   *Randy Craig Wolfe Trust v. Led Zeppelin*, 952 F.3d 1051 (9th Cir. 2020) ...................... 32, 35

*Benson v. Coca–Cola Co.*,
   795 F.2d 973 (11th Cir.1986) (en banc) ................................................................ 16

*Brainard v. Vassar*,
   625 F. Supp. 2d 608 (M.D. Tenn. 2009) .............................................................. 21

*Brown v. Twentieth Cent. Fox Home Ent.*,
   2015 WL 5081125 (E.D. Ky. Aug. 27, 2015) ...................................................... 25

*Burgin v. Lahaye*,
   399 F. App'x 464 (11th Cir. 2010) ...................................................................... 16

*Cap. Recs., LLC v. ReDigi Inc.*,
   934 F. Supp. 2d 640 (S.D.N.Y. 2013) ................................................................. 29

*Coles v. Wonder*,
   283 F.3d 798 (6th Cir. 2002) .............................................................. 13, 14, 15

*Crane v. Poetic Prods. Ltd.*,
   593 F. Supp. 2d 585 (S.D.N.Y. 2009), *aff'd*, 351 F. App'x 516 (2d Cir. 2009) ...................... 31

*Danjaq, LLC v. Universal City Studios, LLC*,
   2014 WL 7882071 (C.D. Cal. Oct. 2, 2014) ........................................................ 30

*Davis v. Am. Broad. Cos.*,
   2010 WL 2998476 (W.D. Mich. July 28, 2010) .............................................. 22, 28, 30

*DC Comics v. Towle*,
   802 F.3d 1012 (9th Cir. 2015) ............................................................................ 30

*Design Basics, LLC v. Forrester Wehrle Homes, Inc.*,
   2018 WL 1583103 (N.D. Ohio Mar. 30, 2018) .................................................... 18

*Ellis v. Diffie*,
   177 F.3d 503 (6th Cir. 1999) .............................................................. 13, 16, 17

*Enchant Christmas Light Maze & Market Ltd. v. Glowco, LLC,*
    958 F.3d 532 (6th Cir. 2020) ...................................................... 21, 22, 26

*Eng v. Captain Blue Hen Comics,*
    2014 WL 2941280 (E.D.N.Y. June 30, 2014) ...................................... 24

*Epikhin v. Game Insight North America,*
    145 F. Supp. 3d 896 (N.D. Cal. 2015) .............................................. 15

*Everly v. Everly,*
    958 F.3d 442 (6th Cir. 2020) ............................................................ 13

*Fogerty v. MGM Group Holdings Corp., Inc.,*
    379 F.3d 348 (6th Cir. 2004) ...................................................... 16, 21

*Gable v. Nat'l Broad. Co.,*
    727 F. Supp. 2d 815 (C.D. Cal. 2010), *aff'd sub nom.*, 438 F. App'x 587 (9th
    Cir. 2011) ............................................................... 18, 20, 24, 35

*Glanzmann v. King,*
    1988 WL 212507 (E.D. Mich. Aug. 29, 1988), *aff'd*, 887 F.2d 265 (6th Cir.
    1989) ....................................................................... 17, 19

*Green v. Harbach,*
    2018 WL 3350329 (S.D.N.Y. July 9, 2018), *aff'd*, 750 F. App'x 57 (2d Cir.
    2019) .................................................................... 24, 34, 35

*Hobbs v. John,*
    722 F.3d 1089 (7th Cir. 2013) .......................................................... 31

*Jones v. Blige,*
    2006 WL 3343741 (E.D. Mich. Nov. 17, 2006), *aff'd*, 558 F.3d 485 (6th Cir.
    2009) ........................................................................ 13

*Jones v. Blige,*
    558 F.3d 485 (6th Cir. 2009) .................................................. 13, 19, 20

*Kaye v. Cartoon Network, Inc.,*
    297 F. Supp. 3d 362 (S.D.N.Y. 2017) .............................................. 30

*Kodadek v. MTV Networks, Inc.,*
    152 F.3d 1209 (9th Cir. 1998) .......................................................... 14

*Meta-Film Associates Inc. v. MCA, Inc.,*
    586 F. Supp. 1346 (C.D. Cal. 1984) .............................................. 19

*Murray Hill Publ'ns, Inc. v. Twentieth Century Fox Film Corp.,*
    361 F.3d 312 (6th Cir. 2004) ...................................................... 17, 21

*Parker v. Hinton,*
   2023 WL 370910 (6th Cir. Jan. 24, 2023) ................................................................ 14

*Reed Elsevier, Inc. v. Muchnick,*
   559 U.S. 154 (2010) ...................................................................................................... 14

*Seiler v. Lucasfilm, Ltd.,*
   808 F.2d 1316 (9th Cir. 1986) ...................................................................................... 14

*Stromback v. New Line Cinema,*
   384 F.3d 283 (6th Cir. 2004) .......................................................................... 21, 22, 30, 31

*Twentieth Century Fox Film Corp. v. Marvel Enters., Inc.,*
   155 F. Supp. 2d 1 (S.D.N.Y. 2001) .............................................................................. 28, 29

*Watt v. Butler,*
   457 F. App'x 856 (11th Cir. 2012) ............................................................................... 16

*Weller v. Flynn,*
   312 F. Supp. 3d 706 (N.D. Ill. 2018) .................................................................. 17, 24, 32, 35

*Wild v. NBC Universal, Inc.,*
   2011 WL 13272427 (C.D. Cal. June 28, 2011) ........................................................... 29

*Williams v. Crichton,*
   84 F.3d 581 (2d Cir. 1996) ........................................................................................... 24

*Zella v. E.W. Scripps Co.,*
   529 F. Supp. 2d 1124 (C.D. Cal. 2007) ...................................................................... 22

**FEDERAL STATUTES**

17 U.S.C. § 408(b)(1) ........................................................................................................... 14

17 U.S.C. § 410(c) ................................................................................................................ 15

17 U.S.C. § 411(a) ................................................................................................................ 14

**RULES - OTHER**

Fed. R. Civ. P. 56(a) ............................................................................................................ 13

**OTHER AUTHORITIES**

2 *Nimmer on Copyright* § 7.16[B][1][a] .......................................................................... 14

*Patry on Copyright* § 9:36 & n.12 .................................................................................... 16

# I.    **INTRODUCTION**

Defendant Buena Vista Books, Inc. ("Buena Vista" or "Defendant")[1] respectfully submits this motion for summary judgment on Plaintiff John Antony's copyright infringement claim.

Plaintiff alleges that *The Zodiac Legacy*—a 1,500-page, illustrated superhero trilogy for middle-grade readers by Stan Lee (co-creator of *The Avengers*, *X-Men*, and more) and Stuart Moore (a well-known author of superhero literary works)—was copied from protected expression in his own Works: a 91-page screenplay entitled *Zodiac Regiment Twelve* ("Screenplay") and a short, handwritten document describing the screenplay's characters ("Character Bios").[2] After 18 months of discovery, more than 100,000 pages of produced documents, and nine depositions, Plaintiff has uncovered no evidentiary support for his fantastical theory. The uncontroverted evidence shows that Buena Vista is entitled to judgment as a matter of law for four reasons.

First, extensive, undisputed evidence establishes that *The Zodiac Legacy*'s creators independently created the trilogy and its team of superheroes with powers derived from the Chinese zodiac. *The Zodiac Legacy*'s creators drew upon their decades of experience authoring superhero works, and on publicly available information on the Chinese zodiac, a perpetually repeating twelve-year cycle of animal avatars assigned to each year, e.g., Rat, Ox, Tiger, etc.[3]

Second, Plaintiff can only speculate that *The Zodiac Legacy*'s creators accessed his Works. He contends (evidence-free) that he provided his Works to an unnamed woman whom he

---

[1] Disney Press, an imprint of Disney Book Group, published *The Zodiac Legacy*; Disney Book Group's assets were transferred to Buena Vista in a corporate restructuring. *See* R. 45. For ease of reference, this Motion refers to all three entities as Buena Vista.

[2] Buena Vista lodged copies of the *Zodiac Legacy* trilogy and two related e-books with the Court. *See* R. 26-1; R. 50; R. 53. The parties have stipulated to their authenticity. Plaintiff filed deposit copies of his Works as exhibits to R. 56-1.

[3] *See* Decl. of Usha C. Vance in Support of Motions of Defendant Buena Vista Books, Inc. (Sept. 28, 2023) ("Vance Decl."), Ex. 200 ("Hull Report") at 6; Ex. N ("Hull Dep.") 14:12-15:7. All exhibits cited in this Motion were concurrently filed as exhibits to the Vance Declaration, unless otherwise specified.

believed to be associated with an unidentified film company with some relationship to The Walt Disney Company. He has no evidence that his Works leapt across corporate lines into book publishing and then into the hands of *The Zodiac Legacy*'s creators. The uncontroverted evidence is, instead, that *The Zodiac Legacy*'s creators never saw his Works.

Third, Plaintiff's Works and *The Zodiac Legacy* are not substantially similar, and instead tell distinctly different stories. Plaintiff cannot, as a matter of law, lay claim to the bare concept of a superhero tale based on the Chinese zodiac. A growing body of popular American film and literature features Chinese zodiac-themed superheroes and other fantastical characters,[4] building on superhero tropes and traditions that Stan Lee pioneered. In fact, Plaintiff—prompted by a placemat at his local Chinese restaurant—drew inspiration from Stan Lee's *X-Men* to arrive at his own Screenplay's zodiac superhero concept.

Fourth, a more fundamental defect in Plaintiff's claim calls for summary judgment. He never satisfied the threshold requirement for this copyright infringement suit: depositing with the Copyright Office a "bona fide" copy of the works allegedly accessed and copied by *The Zodiac Legacy*'s creators. He *does not even have a copy* of the version of his Works he allegedly gave, in 2006, to an unnamed woman supposedly affiliated with an unidentified Disney film company.

## II. BACKGROUND

### A. Defendants Independently Created *The Zodiac Legacy*.

At a high level, *The Zodiac Legacy* trilogy tells the story of a group of individuals of varying ages who absorb superpowers associated with the 12 animals of the Chinese zodiac, after they are released into the world by a war contractor bent on world domination. Two teams of zodiac-powered superheroes—one fighting for good, and the other for evil—emerge and fight against each other, but ultimately come together in an epic battle against the dragon power, which

---

[4] *See* Hull Report at 22-28.

has consumed its human host and threatens world destruction.

### 1. POW! Entertainment Originates *The Zodiac Legacy*'s Concept.

The undisputed evidence shows that Lee's company, POW! Entertainment ("POW!") originated the concept for *The Zodiac Legacy* in 2011. Lee, the legendary talent behind such storied superhero franchises as *X-Men*, *The Avengers*, *Spider-Man*, *Black Panther*, *Iron Man*, and *The Hulk*,[5] originated or popularized countless tropes in the superhero genre. Lee's *X-Men* and *The Avengers* each feature teams of superheroes recruited from disparate backgrounds and countries.[6] Lee also often based modern-day superheroes on ancient mythology, as with Thor (the Norse god of Thunder, and a member of *The Avengers*).[7]

Lee, with his business partner Gill Champion, founded POW! in 2001 to license Lee's new superhero concepts to other companies for development into films, books, and other works.[8] In 2011, POW! sought to tap into the Chinese and Asian markets with new superhero franchises, including several based on Chinese mythology.[9]



[11]

---

[5] *See, e.g.*, Ex. M ("Champion Dep.") 19:17-20:18; Ex. K ("Voccola Dep.") 17:10-18:6; Ex. I ("Moore Dep.") 47:12-22.

[6] *See* Voccola Dep. 84:14-86:4; Moore Dep. 56:17-57:1.

[7] *See, e.g.*, Champion Dep. 31:2-19, 164:18-165:16.

[8] *See, e.g.*, Champion Dep. at 22:15-23:1; Ex. L ("Luperi Dep.") 28:17-29:10; Voccola Dep. 26:5-23, 46:21-47:4.

[9] *See* Champion Dep. 27:10-30:23, 91:11-94:6; Luperi Dep. 33:17-34:9; Voccola Dep. 24:18-26:4, 41:9-43:5.

[10] Champion Dep. 42:5-43:25.

[11] Champion Dep. 39:10-41:25, 45:3-47:1, 56:17-25; Luperi Dep. 55:11-56:24; Voccola Dep. 51:1-15; Ex. 101.



[REDACTED][17]

    After Voccola worked up an initial list of superhero characters and their powers,

Champion instructed him to ███████████████████████████████████████████████[18]

Voccola prepared drafts for Champion and Lee, who gave input and approval throughout the

development process.[19]  The resulting pitch was for a feature film entitled *The Zodiac*, expressly

modeled on *The Avengers*.[20]  It featured a young, first-generation, Chinese-American protagonist

clashing with his traditional parents.[21]  Voccola named him Steven Lee, combining Voccola's

---

[12] *See* Voccola Dep. 52:8-14, 54:19-55:19; Luperi Dep. 57:21-59:25, 68:12-22.
[13] *See* Voccola Dep. 67:8-69:3; Hull Report at 8.
[14] Voccola Dep. 56:14-57:22.
[15] *Id.* at 57:8-21, 104:5-17, 160:16-161:1.
[16] *Id.* at 59:2-21.
[17] *See id.* at 58:8-61:19.
[18] *Id.* at 82:22-86:21; *see* Champion Dep. 57:20-60:1, 65:16-66:18; Ex. 106.
[19] *See* Champion Dep. 49:20-79:20.
[20] *See id.* at 58:21-60:20; Voccola Dep. 84:11-85:17, 94:23-96:2; Ex. 76; Ex. 106.
[21] *See* Voccola Dep. 69:13-71:10, 91:13-93:11; Ex. 76.

first name with Stan Lee's surname.[22]  Steven and the other zodiac-powered superheroes, who were recruited from across space and time to form a team in the present, faced off against an international group of adversaries, known as the Organization.[23]  Apart from Stan Lee's past superhero creations, POW!'s creative team consulted only online reference material on the Chinese zodiac and historical events when preparing *The Zodiac* pitch.[24]

### 2. Nachie Marsham Transforms POW!'s Concept into a Middle-Grade Book Series.

In February 2012, POW! submitted *The Zodiac* pitch to an attorney at The Walt Disney Company, who circulated it to a broader group, including Rich Thomas, a Buena Vista book editor.[25]  Thomas asked Nachie Marsham, an editor on his team, to evaluate the concept as a potential book series for middle-grade readers (ages 8 to 12).[26]  The project's "main appeal" to Marsham was its association with Lee—"that Stan Lee, legendary comics creator, was bringing a story that felt like the materials his legacy was built on."[27]  Marsham was only interested in acquiring the project if Stan Lee would sign on as an author and help promote the books.[28]

Using POW!'s pitch as a starting point, Marsham prepared a proposal for a trilogy of illustrated, middle-grade novels.[29]  The first novel focused on the identification and recruitment of the Chinese zodiac-powered superheroes, the second on the growing dangers of those powers, and the third on the battle to save the world from those powers.[30]  Marsham conducted "research predominantly online to familiarize [him]self a little bit better with the mythology and the kind of

---

[22] *See* Champion Dep. 60:22-61:6; Voccola Dep. 69:22-70:11.
[23] *See, e.g.*, Ex. 76; Voccola Dep. 106:14-107:8,
[24] *See* Champion Dep. 97:1-98:11; Voccola Dep. 54:22-55:19, 61:22-63:13.
[25] *See* Champion Dep. 79:21-80:11; Luperi Dep. 78:1-79:10; Ex. 76; Ex. 128.
[26] Ex. J ("Marsham Dep.") 24:18-25:1; Ex. 76.
[27] Marsham Dep. 42:15-44:1.
[28] *Id.*
[29] Ex. 41.
[30] Marsham Dep. 66:20-67:6; Ex. 41.

base legends behind the animals of the Chinese zodiac."[31]  He kept Steven Lee as the protagonist, giving him the tiger power, and divided the remaining zodiac signs among 13 total characters, both superheroes and supervillains, with two sharing the dragon power.[32]  Marsham looked to both "real world and fantastical" sources of inspiration in selecting superpowers.[33]  For instance, he gave the snake the power of hypnosis, drawing from "the nature documentary to the kind of cartoonish-like snake hypnosis that you see in some old Disney cartoons like Aladdin."[34]

Marsham's proposal described how the Chinese zodiac powers would operate in this fictional universe, involving 12 mystical pools that released the zodiac powers every 144 years to find human hosts; he cut POW!'s time-travel element as overly complicated for the age group.[35]  He sketched out a small number of settings and plot points for the story.[36]  He used the "general structure of having the . . . younger characters, the hero characters, on the run from these older, authoritarian characters," since it "plays well" with middle-grade readers and aligns with "how you see the world when you are 8 to 12 years old."[37]  He hired Andie Tong, a well-regarded illustrator of superhero works, to prepare concept art and eventually to illustrate the series.[38]

### 3.    Stuart Moore Authors the Three-Book Series.

In 2013, Marsham hired Stuart Moore, a well-known comic book writer, as an independent contractor to write the trilogy.[39]  Moore had previously authored works involving

---

[31] Marsham Dep. 65:25-66:10, 149:8-150:17.
[32] *Id.* at 67:7-68:12, 74:16-75:6; Moore Dep. 33:15-34:6; Ex. 41.
[33] Marsham Dep. 75:15-16.
[34] *Id.* at 75:7-24; Ex. 41.
[35] Marsham Dep. 37:5-11, 71:11-74:3; Moore Dep. 34:7-36:5; Ex. 41.
[36] *See, e.g.*, Marsham Dep. 68:18-71:9; Moore Dep. 34:11-36:5; Ex. 40; Ex. 41.
[37] Marsham Dep. 76:17-77:9.
[38] *See id.* at 44:5-25, 78:16-80:10; Champion Dep. 105:4-11; Voccola Dep. 133:24-134:11; *see* Ex. 41; Ex. 75.
[39] *See* Marsham Dep. 46:4-49:18; Moore Dep. 19:21-20:16, 25:25-26:8, 46:23-47:8; Voccola Dep. 119:10-121:8.

international superhero teams, including works based on *X-Men*.[40]  Marsham gave Moore his

proposal and illustrated decks, but left it to him to "take the various elements that exist so far, and

really craft a complete and engaging story."[41]  Moore and Marsham were responsible for

determining the final lineup of characters and their ages, genders, home countries, and

superpowers.[42]  Moore had sole responsibility for developing *The Zodiac Legacy*'s storyline,

character arcs, settings, dialogue, and other literary features, and Marsham provided editorial

feedback.[43]  Lee and Champion at POW! occasionally reviewed and commented via Marsham.[44]

Apart from these inputs, Moore independently conceptualized and wrote all 1,500 pages of the

*Zodiac Legacy* trilogy.[45]  Moore's "biggest influence" was Stan Lee's *X-Men*, including "the idea

of people with extraordinary powers popping up in different parts of the globe and being recruited

by either the good guys or the bad guys."[46]  The *X-Men* were also a team of youthful superheroes,

"headquartered at Professor Xavier's school for extraordinary youngsters."[47]

Moore conducted extensive research in order to "flesh out all aspects" of the story and

"make it seem real."[48]  He searched for background on the zodiac signs that he could use to "flesh

out, and in some cases, suggest the personalities of the various characters, . . . the nuances of their

powers."[49]  He researched "visual motifs that might be useful in the course of the book."[50]  And

he spoke with friends of Chinese heritage in an effort to portray the character Steven Lee "in a

responsible and respectful way and in a way that would ring true within the story"; this inspired

---

[40] Moore Dep. 57:13-58:3, 66:23-25.
[41] Ex. 42; Moore Dep. 29:2-14, 43:9-44:5; Marsham Dep. 50:3-52:22.
[42] *See, e.g.*, Marsham Dep. 85:11-88:5; Moore Dep. 79:18-80:11, 90:13-94:4.
[43] *See, e.g.*, Marsham Dep. 52:8-53:13, 94:19-95:6; Moore Dep. 43:9-22, 53:5-8, 101:22-104:4.
[44] Marsham Dep. 61:24-63:14; Moore Dep. 51:5-52:2.
[45] Moore Dep. 53:5-8.
[46] *Id.* at 58:15-61:18.
[47] *Id.* at 63:22-64:17.
[48] *Id.* at 68:7-79:1.
[49] *Id.*
[50] *Id.*

him to create Steven's grandfather, who appeared to Steven in dream sequences, to strengthen Steven's character arc and connect him to his Chinese heritage.[51]

### 4. Buena Vista Markets and Sells *The Zodiac Legacy*.

Marketing for *The Zodiac Legacy*, published in 2015-17, understandably revolved around Stan Lee.[52] To capitalize on his enormous fame, Buena Vista poured resources into promoting *The Zodiac Legacy*; per Marsham, the idea of "Stan Lee . . . bringing a new prose story to the world" was expected to "stop" audiences "in their tracks" and drive sales.[53] Lee promoted *The Zodiac Legacy* in interviews and at industry events, book signings, and fan conventions.[54] He was known as a "master promoter" who was "very good at connecting with an audience."[55]

Nonetheless, the series was not profitable. Sales revenues did not cover the cost of making and marketing the books, which lost money.[56] Papercutz, a third party, published three licensed *Zodiac Legacy* comic books, which did not make the books profitable.[57] The series was never developed for television or film, which Marsham and POW! attributed to lower than expected sales.[58]

### B. <u>Plaintiff's Works</u>

Plaintiff claims to have begun his Works (his Screenplay and Character Bios) in 2000,

---

[51] *Id.*; Ex. 44.
[52] *See*, *e.g.*, Champion Dep. 118:5-125:21, 147:11-25, 165:17-176:3 ("[I]t was very Stan Lee-centric"); Voccola Dep. 122:11-124:8 ("[E]verything that we did was always based on Stan."); Marsham Dep. 97:6-99:22; Moore Dep. 108:5-109:9.
[53] Marsham Dep. 97:20-25.
[54] *See, e.g., id.* at 96:4-99:22; Champion Dep. 137:24-144:22, 147:11-25, 155:2-176:16; Moore Dep. 108:5-110:9.
[55] Moore Dep. 108:12-15.
[56] *See* Ex. P (BV-00016644) at Tab "Zodiac Legacy Contribution" (identified in response to interrogatories propounded by Plaintiff).
[57] *See id.* at Tab "Zodiac Legacy Contribution"; *see also id.* at Tab "Subrights & Licensing Detail" (listing licensing revenue inputs to "Zodiac Legacy Contribution" calculations).
[58] *See* Champion Dep. 151:23-152:17, 178:7-186:21, 210:10-212:18; Luperi Dep. 127:2-128:5; Marsham Dep. 101:23-102:5.

after seeing a Chinese restaurant placemat that featured information on the Chinese zodiac.[59] Plaintiff also drew inspiration from past martial arts experience and his interest in Bruce Lee.[60] Plaintiff claims he worked on his Works through at least 2010.[61]  In a handwritten summary, he described his Screenplay as "the X-Men for the Yugio age.  It has the same potential as Power Rangers and Teenage Mutant Ninja Turtles."[62]  The Screenplay told "the story of the formation of the modern cosmic Delta force known as the Zodiac Regiment 12 (ZR-12).  Every age of earth has had the need for order to battle chaos, and 12 amulets are passed down from age to age, giving the recipient the powers of their respective animal in the Chinese zodiac."[63]

Plaintiff's Character Bios, as reflected in the deposit copy that Plaintiff submitted when registering his copyright in 2018, are handwritten notes on a yellow pad that list 12 characters comprising the "*Zodiac Regiment – 12*," along with their names, "code name[s]," superpowers, and a handful of details on their ancestry and heritage.[64]  No ages are listed.  For example, Plaintiff's "tiger" character is "Princess Odira Patel," code-named "Fe Lion," an "Indian princess of very powerful family" who is "betrothed in an arranged marriage she doesn't want" and "[h]as the power of the tiger to paralyze its victim by staring at it."[65]  The copyright registration states that this deposit copy was created in 2005[66]—five years into the development of Plaintiff's Works—but nothing on the document confirms any timing.

Plaintiff's Screenplay, as reflected in the deposit copy that Plaintiff submitted when registering his copyright in 2018, is a 91-page, typewritten film script.[67]  The registration asserts

---

[59] *See* Ex. H ("Antony Dep.") 116:11-13, 157:1-9.
[60] *See id.* at 119:13-23.
[61] *See, e.g.*, *id.* at 155:6-9, 403:4-8.
[62] Ex. 11 at ANT000327; Antony Dep. 138:1-21.
[63] Ex. 11 at ANT000327; Antony Dep. 139:22-140:4.
[64] *See* R. 56-1, Ex. 2 at 98.
[65] *Id.* at 100.
[66] R. 48-1 at 1.
[67] R. 56-1, Ex. 1 at 4-96.

that the deposit copy was created in 2005, but, like the Character Bios, nothing on the document

confirms any timing.[68] The Screenplay opens on a Himalayan mountaintop with a conversation

between two characters: an "ancient" "Asian man" "levitating in the air," named Lee Ching and

"Steve Fin, a 30 something carcasion disuple [sic] of the ancient one."[69] Lee Ching and his

cousin Lin Ching are locked in an eternal battle, with Lee Ching seeking to bring order to the

world and Lin Ching seeking to plunge it into chaos.[70] As tsunamis, avalanches, volcanic

eruptions, tornados, and other natural disasters break out and diplomatic tensions develop, Lee

Ching recruits 12 superheroes to his cause.[71] The team works together to defeat Lin Ching's

Scions of Chaos and avert war between Israel and Egypt.[72] There are off-color jokes ("I haven't

had this much fun since The Nazi Concentration Camps!"), curse words, prejudiced language (a

disabled character is "useless"), and other elements unsuitable for 8 to 12 year olds.[73]

### C.     Plaintiff's Attendance at a 2006 Screenwriting Convention.

In October 2006, Plaintiff flew to Los Angeles to attend Screenwriting Expo 5, a

"pitchfest" for aspiring screenwriters ("2006 Pitchfest").[74] Plaintiff claims that he took with him

typewritten versions of his Character Bios and Screenplay—versions which he admits he no

longer possesses.[75] He signed up and paid to make five-minute pitches to seven film

companies.[76] The seven companies' names are memorialized in Plaintiff's handwritten notes and

confirmed in the 2006 Pitchfest organizers' records, and, in some cases, business cards that he

---

[68] R. 48-1 at 3.

[69] R. 56-1, Ex. 1 at 4.

[70] *See id.* at 26, 47-48.

[71] *See, e.g.*, *id.* at 7-10, 46-47, 21-22.

[72] *See id.* at 48-50.

[73] *E.g.*, *id.* at 40, 56, 88.

[74] *See* Antony Dep. 287:15-290:12.

[75] *See id.* at 330:10-14, 352:4-12.

[76] *Id.* at 300:8-303:10, 339:13-345:24, 350:24-351:2; *see* Ex. 27; Ex. 28. These film production companies are Asylum Entertainment, Concept Entertainment, Catchphrase Entertainment, Bold Films, Landscape Entertainment, David Gatehouse Productions, and John Baldecchi Productions.

kept for 15 years.[77]  Not among the seven: The Walt Disney Company or any Disney affiliate.[78]

Plaintiff has no written records of any other pitch meetings, yet he testified that when he arrived

at the 2006 Pitchfest, "Disney was not available" for any pitch meetings, until he "came back and,

lo and behold, Disney was available."[79]

Contrary to his contemporaneous notes and the 2006 Pitchfest records, in both Complaints

filed in this case, Plaintiff alleged that he "had a one-on-one scheduled pitch meeting with a

representative of Disney, whose name he believes to have been Kathie Fong Yoneda."[80]  Yoneda

submitted a declaration in this case explaining that, although she was indeed a screenwriting

consultant in 2006, she was not an employee of any Disney affiliate.[81]  After that, Plaintiff

retracted his identification of Yoneda.[82]  Plaintiff testified that he never got the name, title, or

employer of the allegedly Disney-associated woman with whom he claims to have met.[83]  To

identify this person, he searched the Internet, found that Kathie Fong Yoneda had "a blog

associated with PitchFests and things," and had the "initial response" that "that may have been the

person I met with."[84]  That was enough for Plaintiff to identify Yoneda—not once, but twice—as

the woman he met with.  At his deposition, the only description Plaintiff could provide was of a

"rude" woman who "leaned toward Asian with dark brown hair" and a "[d]arker complexion,"

was of medium height and build, and did not wear glasses.[85]  He acknowledged he does not have

a copy of whatever version of his Works he allegedly left with this person.[86]

---

[77] *Id.*; Ex. 25.
[78] Antony Dep. 345:22-24.
[79] *Id.* at 300:20-301:4, 346:3-10.
[80] R. 1 ¶ 28; R. 48 ¶ 28.
[81] R. 39-2.
[82] R. 40-1.
[83] Antony Dep. 294:20-295:8, 307:6-308:5, 351:3-21.
[84] *Id.* at 307:6-309:9.
[85] *Id.* at 294:17-295:19, 309:3-9, 349:1-352:3.
[86] *Id.* at 338:17, 352:4-8.

*The Zodiac Legacy*'s creators—the individuals at POW!, the book editor Nachie Marsham, and independent contractor author Stuart Moore—testified that they did not attend the 2006 Pitchfest and have never encountered or reviewed Plaintiff's Works.[87]  Nothing in the record contradicts their unequivocal testimony.

## III.   <u>PROCEDURAL HISTORY</u>

In October 2018, three years after the first *Zodiac Legacy* book was published, Plaintiff registered copyrights for his handwritten Character Bios and typewritten Screenplay; he filed this suit in December 2018.[88]  Buena Vista moved to dismiss Plaintiff's Second Amended Complaint in October 2020 for failure to state a claim, arguing that Plaintiff had failed to plausibly allege access to his works by *The Zodiac Legacy*'s creators, and had selectively described random points of overlap between his Screenplay and *The Zodiac Legacy*—falling far short of substantial or striking similarity of *protected* expression.[89]  The denial of Buena Vista's motion turned on the Court's view that such arguments were better suited to summary judgment, after fact discovery and under a standard "which involves a more scrutinous factual evaluation than a motion to dismiss," where the Court "accepts Plaintiff's factual allegations as true."[90]  The Court expressed no opinion on the strength of Plaintiff's copyright infringement claim and declined to review Plaintiff's Works and *The Zodiac Legacy* to conduct a substantial similarity analysis.[91]

Buena Vista produced 17,234 pages of documents in response to Plaintiff's requests.  Nine third parties produced 90,706 pages of documents in response to subpoenas, including approximately 7,500 pages produced by POW! and 9,500 pages produced by Stuart Moore.  The

---

[87] Marsham Dep. 50:20-51:1, 104:13-111:8; Moore Dep. 112:17-115:17; Voccola Dep. 61:22-62:16, 136:14-143:13; Champion Dep. 41:20-25, 44:16-45:2, 97:1-101:4, 111:23-112:2, 187:11-188:14; Luperi Dep. 101:23-104:12.
[88] *See* R. 1-1.
[89] R. 52 (motion); R. 61 (reply).
[90] R. 65 at 5, 7.
[91] *Id.* at 7.

parties conducted seven fact witness depositions and two expert witness depositions.[92]

## IV.   <u>ARGUMENT</u>

Plaintiff "must prove two things" to prevail on his copyright infringement claim: (1) "that he had ownership of a valid copyright," and (2) that *The Zodiac Legacy*'s creators "copied a protected interest in the work."[93]  The Sixth Circuit has acknowledged that "[d]irect evidence of copying is rare, so frequently the plaintiff will attempt to establish an inference of copying by showing (1) access to the allegedly-infringed work by the defendant(s) and (2) a substantial similarity between the two works at issue."[94]  This raises only a *presumption* of copying, which, "[u]nder Sixth Circuit authority, . . . may be unequivocally rebutted by showing evidence of 'independent creation' of the allegedly infringing work.  [Where] independent creation is established as a matter of law, similarity is not relevant to the Court's analysis."[95]

After 18 months of discovery, a "more scrutinous factual evaluation" of Plaintiff's claims is finally possible.[96]  The result is clear:  No evidence supports Plaintiff's claim, while reams of uncontroverted evidence point the other way.  Because "no genuine dispute as to any material fact" exists, Buena Vista "is entitled to judgment as a matter of law" on multiple grounds.[97]

### A.   <u>Plaintiff Lacks a Valid Copyright Registration for the Version of His Works That Buena Vista Allegedly Accessed.</u>

Plaintiff did not secure a valid copyright registration over whatever version of his Works he allegedly had at the 2006 Pitchfest—the sole version that he alleges *The Zodiac Legacy*'s creators accessed.  That dooms his claim, entitling Buena Vista to summary judgment.

---

[92] Vance Decl. ¶ 5.
[93] *Coles v. Wonder*, 283 F.3d 798, 801 (6th Cir. 2002).
[94] *Ellis v. Diffie*, 177 F.3d 503, 506 (6th Cir. 1999).
[95] *Jones v. Blige*, 2006 WL 3343741, at *7 (E.D. Mich. Nov. 17, 2006), *aff'd*, 558 F.3d 485 (6th Cir. 2009).
[96] R. 65 at 5.
[97] *Everly v. Everly*, 958 F.3d 442, 448 (6th Cir. 2020) (quoting Fed. R. Civ. P. 56(a)).

The Copyright Act requires that "no civil action for infringement of the copyright in any United States work shall be instituted until preregistration or registration of the copyright claim has been made" with the Copyright Office.[98]  This is a "precondition to suit"[99]:  "If a plaintiff cannot prove that the item in suit corresponds to a registered work, the cause of action fails."[100]  Section 408 of the Copyright Act requires that, to obtain a copyright registration, an applicant must deposit "one complete copy" of the work.[101]  Section 408 "permits the deposit of 'bona fide copies of the original work only.'"[102]  As the Sixth Circuit has explained, a "bona fide cop[y]" is "virtually identical" to the original work for which copyright registration is sought, forming the basis for a copyright infringement suit.[103]

Courts regularly grant summary judgment where a plaintiff's deposit copy cannot be proven to be a "bona fide" copy of the work allegedly accessed and infringed by the defendant.  As the Sixth Circuit has explained, "[w]hile the rule that we adopt may seem harsh, it avoids the factual disputes over creation dates that are on vivid display in this case . . . .  Rather than put the interests of creative artists at risk, the rule protects those interests by encouraging artists to either register copyrights upon creation of a new work or, at least, to retain copies of their work.  By doing so, they can protect themselves against claims of copyright infringement or, if necessary, enforce their own copyrights."[104]

---

[98] 17 U.S.C. § 411(a).

[99] *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 166 (2010).

[100] 2 *Nimmer on Copyright* § 7.16[B][1][a]; *see Parker v. Hinton*, 2023 WL 370910, at *1 (6th Cir. Jan. 24, 2023) (affirming grant of summary judgment on copyright infringement claim because "Plaintiffs failed to establish the prerequisites to suit—copyright registration and deposit").

[101] 17 U.S.C. § 408(b)(1).

[102] *Coles*, 283 F.3d at 802 (quoting *Seiler v. Lucasfilm, Ltd*., 808 F.2d 1316, 1322 (9th Cir. 1986)).

[103] *Coles*, 283 F.3d at 802; *see Kodadek v. MTV Networks, Inc.*, 152 F.3d 1209, 1212 (9th Cir. 1998).

[104] *Coles*, 283 F.3d at 802.

Here, the versions of the Works that Plaintiff copyrighted—an undated, hand-scrawled document titled "character bios," and an undated typewritten screenplay—are undisputedly *different* from the versions of his Works that he allegedly brought with him to the 2006 Pitchfest.[105] Plaintiff's declaration, introducing these documents in opposition to Buena Vista's motion to dismiss, stated, "I no longer have an exact copy of the copyedited version submitted to Disney."[106] The registrations' statements that the deposit copies were created in 2005—more than 12 years before Plaintiff registered them—are not entitled to the presumption of truth,[107] and nothing on the documents themselves corroborates that date. Plaintiff baldly contends that the version of his works he had at the 2006 Pitchfest were "wholly derived" from the deposit copies.[108] But that assertion cannot cure an invalid copyright registration.

Plaintiff's situation resembles that of the mobile app developer plaintiff in *Epikhin v. Game Insight North America*, who deposited source code from an earlier iteration of an app (which the allegedly infringed source code was based upon) as part of his copyright registration, because he no longer had access to the relevant version of the code.[109] The court found that the deposited source code was not a "bona fide copy" of the allegedly infringed work, mandating dismissal.[110] The Court should likewise grant summary judgment to Buena Vista on this ground.

### B. *The Zodiac Legacy* Was Independently Created.

The Court need look no further than the uncontroverted evidence that *The Zodiac Legacy* was independently created to grant Buena Vista summary judgment on Plaintiff's claim. As the Sixth Circuit explained in *Ellis v. Diffie*, "detailed and specific evidence of independent creation"

---

[105] R. 56-1 ¶¶ 5-6 (describing the 2006 Works as "typed, copyedited, and generally cleaned up version[s]" of the deposit copies); *see* Antony Dep. 131:14-137:25, 352:4-25.
[106] R. 56-1 ¶ 6.
[107] 17 U.S.C. § 410(c).
[108] R. 56-1 ¶ 5.
[109] 145 F. Supp. 3d 896, 898-99 (N.D. Cal. 2015).
[110] *Id.* at 905.

of the allegedly infringing work will "overc[o]me any implicit suggestion of plagiarism developed by [the plaintiff's] proof" relating to access and substantial similarity.[111]

In *Ellis*, the Sixth Circuit found uncontroverted evidence of independent creation where "[m]any of the defendants testified in detail as to the development of" the allegedly infringing song and identified their sources of inspiration, and staff writers "testified about the progression of the song's development during four work sessions."[112]  The Sixth Circuit affirmed the district court's finding that this evidence "overcame any implicit suggestion of plagiarism" presented by the plaintiff's evidence, resulting in dismissal of the claim following a bench trial.[113]  Similarly, where the creators of an allegedly infringing work "testified in detail regarding their collaborative creative process," and "maintained that they had never seen or read" the plaintiff's work, that was sufficient to rebut a presumption of copying; the plaintiff offered no evidence to refute the testimony, and thus summary judgment in favor of the defendant was appropriate.[114]

Here, the undisputed evidence and testimony of *The Zodiac Legacy*'s creators makes plain that the works were independently created:  POW!'s creative team sought to create a team of superheroes à la Stan Lee's prior works, including *X-Men*, and conducted Internet research on the Chinese zodiac and its animals; Nachie Marsham transformed POW!'s pitch into a proposal for a middle-grade book series, building out the characters and premise and researching the Chinese

---

[111] 177 F.3d at 507.  "[S]ince copying is the obverse of independent creation, a defendant does not bear the burden of proving independent creation."  *Patry on Copyright* § 9:36 & n.12 (citing *Fogerty v. MGM Group Holdings Corp., Inc.*, 379 F.3d 348, 352 (6th Cir. 2004); *Ellis*, 177 F.3d at 507)); *see Watt v. Butler*, 457 F. App'x 856, 861 n.2 (11th Cir. 2012) ("[I]ndependent creation attempts to prove the opposite of [a plaintiff's] primary claim, i.e. copying," and "is *not* an affirmative defense").

[112] *Ellis*, 177 F.3d at 505.

[113] *Id.* at 507.

[114] *Burgin v. Lahaye*, 399 F. App'x 464, 467 (11th Cir. 2010); *Benson v. Coca–Cola Co.*, 795 F.2d 973, 975 (11th Cir.1986) (*en banc*) ("testimony [of writers of allegedly infringing song] constitutes uncontradicted evidence of independent creation, fully negating any claim of infringement"); *Watt*, 457 F. App'x at 861 (affirming grant of summary judgment where creator of allegedly infringing riff testified as to his creation process).

zodiac online; and Stuart Moore, an experienced writer in the superhero genre, fleshed out the plot, characters, and settings and wrote 1,500 pages of prose—again leveraging both research on the Chinese zodiac and Stan Lee's prior works.  Their testimony accounts for the origins of every element of *The Zodiac Legacy* that Plaintiff cites as a purported similarity to his Works.  And even if Lee and Moore's own prior works contain the same elements as Plaintiff's work, they had "no reason, beyond the illicit thrill of copyright infringement, to copy wrongfully from another what [they] could legally copy from [themselves]."[115]  "[W]here an element occurs both in the defendant's prior work and the plaintiff's prior work, no inference of copying can be drawn."[116]

C. **There Is No Evidence that Buena Vista—or *The Zodiac Legacy*'s Creators— Accessed Plaintiff's Works.**

"Access" to a copyrighted work means "'having a reasonable opportunity to [view] the plaintiff['s] work and thus having the opportunity to copy.'"[117]  "[A]ccess may not be inferred through mere speculation or conjecture."[118]  Neither a "mere assertion of access" nor a "'bare possibility' of access" satisfies the standard.[119]  Instead, a plaintiff must show that "the copyrighted work was sent directly to any defendant [who created the allegedly infringing work] or a close associate of any defendant," or that a "channel of communication" resulted in the copyrighted work reaching the defendant.[120]  "Access is not a metaphysical concept, it requires a reasonable possibility that the actual creator(s) has seen (or heard or read) the work which is allegedly infringed."[121]  "The case law discussing access addresses whether actual persons are in

---

[115] *Murray Hill Publ'ns, Inc. v. Twentieth Century Fox Film Corp.*, 361 F.3d 312, 326 (6th Cir. 2004).
[116] *Id.*
[117] *Ellis*, 177 F.3d at 506.
[118] *Id.*
[119] *Murray Hill Publ'ns*, 361 F.3d at 316 (quoting *Glanzmann v. King*, 1988 WL 212507, at *1-2 (E.D. Mich. Aug. 29, 1988), *aff'd*, 887 F.2d 265 (6th Cir. 1989)).
[120] *Weller v. Flynn*, 312 F. Supp. 3d 706, 718 (N.D. Ill. 2018) (internal quotation marks omitted).
[121] *Gable v. Nat'l Broad. Co.*, 727 F. Supp. 2d 815, 827 n.8 (C.D. Cal. 2010), *aff'd sub nom.*, 438 F. App'x 587 (9th Cir. 2011).

a position vis-à-vis the creator to allow for reasonable access."[122]

Plaintiff has no evidence that *The Zodiac Legacy*'s creators reviewed his Screenplay or Character Bios. Instead, he offers his own unsubstantiated testimony that he met with an unnamed woman (contradicting his two Complaints), whom he claims was affiliated with a film company that had a connection with The Walt Disney Company (though he has no idea what her title or role was), at a pitchfest in 2006 and left her a copy of his Works.[123] Plaintiff's dubious claim that an unknown corporate employee of some entity that is *not* Buena Vista received a copy of his works—even if credited—is insufficient to establish access. "Several Circuit Courts, including the Sixth, have rejected bare corporate receipt as sufficient proof of access, requiring plaintiffs to introduce some evidence that it was reasonably possible that the paths of the infringer and the infringed work crossed."[124]

Plaintiff has no evidence that this unnamed woman's alleged access to his works in 2006 equates to access by *The Zodiac Legacy*'s creators in 2012, whether Stan Lee and his colleagues at POW!, or the editor Nachie Marsham at Buena Vista, or the independent contractor author Stuart Moore. Bare corporate receipt does not impute knowledge to all employees affiliated with that specific corporation, nor does it support an inference that the work was passed on to another corporation (another instance of, at most, bare corporate receipt) or to the individuals who created the allegedly infringing work. For instance, in *Glanzmann* the Sixth Circuit "affirmed a district court's refusal to infer access from bare corporate receipt" given that "application of the corporate receipt doctrine would have resulted in the 'implausible . . . quantum leap' that author Stephen

---

[122] *Id.*
[123] *See supra* Part II(C).
[124] *Design Basics, LLC v. Forrester Wehrle Homes, Inc.*, 2018 WL 1583103, at *18 (N.D. Ohio Mar. 30, 2018) (internal quotation marks omitted).

King had access to a script submitted to a secretary at Columbia Pictures."[125] The plaintiff in *Glanzmann* had not "established a relationship" between Stephen King and the secretary who responded to the plaintiff's submission, and instead "simply provided various hypotheticals of how Stephen King may possibly have heard of plaintiff's story."[126] Thus, "it would be unreasonable to presume Columbia was aware of plaintiff's work and even more implausible" to "establish Stephen King's 'access' based on Columbia's 'corporate receipt.'"[127]

The district court in *Glanzmann* determined that a "much more realistic view is that taken in *Meta-Film Associates Inc. v. MCA, Inc*., in which the court noted that in the motion picture industry 'countless unsolicited scripts are submitted every day' and 'it is clearly unreasonable to attribute the knowledge of any one individual . . . to every other individual just because they occupy offices on the same studio lot.'"[128] In *Meta-Film*, the court found insufficient evidence of access where the plaintiff showed his work to a director who was under contract with the defendant studio and worked on the studio lot.[129] As the court explained, "the key feature present [in cases allowing access to be shown circumstantially] was the close relationship linking the intermediary and the alleged copier, which in each case went far beyond the simple fact that they shared a common employer."[130]

The Sixth Circuit's decision in *Jones v. Blige* is also instructive. There, the plaintiff failed to prove access by means of pitching his music to a record executive at Universal Music Group, the publisher of an allegedly infringing album by singer Mary J. Blige.[131] A recording industry

---

[125] *Jones v. Blige*, 558 F.3d 485, 492-93 (6th Cir. 2009) (quoting *Glanzmann v. King*, 1988 WL 212507, at *1-3 (E.D. Mich. Aug. 29, 1988), *aff'd*, 887 F.2d 265 (6th Cir. 1989)).
[126] *Glanzmann*, 1988 WL 212507, at *2.
[127] *Id*.
[128] *Id*. (citation omitted).
[129] 586 F. Supp. 1346, 1355-59 (C.D. Cal. 1984).
[130] *Id.* at 1357.
[131] 558 F.3d at 488-89.

executive at Universal had explicitly asked the plaintiff to "send the product in," then his department opened the package and rejected the demo tape.[132]  The solicitation and access by an executive at the *same company* that published the allegedly infringing song did not stop the Sixth Circuit from concluding that the evidence amounted to bare corporate receipt by Universal, which was insufficient to show access by the *creators* of the allegedly infringing song.[133]  Blige and the other artists involved in creating the allegedly infringing work "were affiliated with [the Universal executive] only through an attenuated corporate connection, and to find a reasonable possibility of access, a jury would be required to make an implausible leap, unsupported by evidence other than bare corporate receipt."[134]

Plaintiff's theory of access—bare corporate receipt of his Works by an unknown employee of a *different* corporation than that which published *The Zodiac Legacy*, nearly a decade before the allegedly infringing work was published—is even more attenuated.  Plaintiff has absolutely no evidence how, after he visited a pitchfest attended by film companies, his Works subsequently traveled across corporate lines—and product categories—to the editor at a book publishing company, much less how they ended up in the hands of Stan Lee and his colleagues at POW!  He may speculate that the unnamed woman at the pitchfest somehow ferried his Works to Stan Lee's company or to book editor Nachie Marsham, but speculation cannot carry his burden, much less rebut the *Zodiac Legacy* creators' uncontroverted testimony that they had never heard of or reviewed Plaintiff's works when developing the trilogy.[135]

> ### D.     *The Zodiac Legacy* Is Not Substantially Similar in Protected Expression to Plaintiff's Works.

---

[132] *See id.* at 489.

[133] *See id.* at 492-93.

[134] *Id.* at 493.

[135] *Id.* at 491 ("[A]ccess may not be inferred through mere speculation or conjecture."); *see Gable*, 727 F. Supp. 2d at 825 (granting summary judgment where plaintiff had "no evidence" to support any allegations of access).

Even if Plaintiff had validly registered his Works, could offer proof of access, and could find evidence undercutting the undisputed testimony of independent creation, Buena Vista would still be entitled to summary judgment because *The Zodiac Legacy* is not substantially similar to protected expression in his Works.[136]

The Sixth Circuit has emphasized that summary judgment is "permissible and may even be required" on copyright claims because

> the question of substantial similarity can usually be decided on the basis of the works themselves and rarely, if ever, involves questions of credibility, the peculiar province of the jury. Also, while judges "may not be qualified literary critics, [they] are fitted by training and experience to compare literary works and determine whether they evidence substantial similarity."[137]

The Sixth Circuit "use[s] a two-step approach to determine whether disputed works are substantially similar."[138] First, the Court must "'filter' out 'the unprotectable aspects of the protected work'" such that, "when the filtering is over, the court is left with 'only the expressive elements' of the protected work."[139] These unprotectable aspects include "ideas . . . , because 'copyright protection extends only to expression of ideas and not to ideas themselves'"; "'*scenes a faire*,' that is, 'incidents, characters or settings which are as a practical matter indispensable, or at least standard, in the treatment of a given topic'"; and "any other 'common' or 'stock' themes and usages."[140] Common "themes, such as saving the world, the battle between good and evil, sibling rivalry or familial secrets and issues, and racial issues; scenes, such as parties; concepts,

---

[136] Plaintiff's claims relate primarily to *The Zodiac Legacy* trilogy, so Buena Vista's substantial similarity arguments focus on those works. Buena Vista's arguments apply equally to its two promotional e-books and Papercutz's three licensed comic books, which feature *The Zodiac Legacy*'s characters.

[137] *Murray Hill*, 361 F.3d at 321.

[138] *Enchant Christmas Light Maze & Market Ltd. v. Glowco, LLC*, 958 F.3d 532, 537 (6th Cir. 2020).

[139] *Brainard v. Vassar*, 625 F. Supp. 2d 608, 616-17 (M.D. Tenn. 2009) (quoting *Fogerty*, 379 F.3d at 352, and *Stromback v. New Line Cinema*, 384 F.3d 283, 294 (6th Cir. 2004)).

[140] *Id.*

such as a dam or barrier between Earth and Hell; and plots, such as foiling the antagonist's attempt to rule the world" do not qualify for copyright protection.[141]  The "Court may take judicial notice of generic elements in creative works," including those that are "generally known and can be verified simply by watching television for any length of time."[142]

After filtering out unprotected elements, the Court must evaluate whether Plaintiff's Work and *The Zodiac Legacy* are substantially similar, meaning "'they are so alike that the later (unprotected) work can fairly be regarded as appropriating the original expression of the earlier (protected) work.'"[143]  At this stage, the Court should "examine the theme, characters, plot, sequence, pace, and setting for similarities," bearing in mind that "'random similarities scattered throughout the works'" cannot support a finding of substantial similarity.[144]  The Court must "consider substantial similarity from the viewpoint of the intended audience, which is normally the lay public, or the ordinary reasonable person."[145]

### 1. Plaintiff's Account of the Similarities Between the Works Is Rife with Misrepresentations.

When asked at his deposition to identify the purported similarities of protected expression between his Works and *The Zodiac Legacy*, Plaintiff began by describing a supposedly identical "sequence of events," but conceded upon being pressed that this meant "mix[ing] and match[ing]" to suit his narrative for litigation.[146]

---

[141] *Stromback*, 384 F.3d at 297.
[142] *Zella v. E.W. Scripps Co.*, 529 F. Supp. 2d 1124, 1129 (C.D. Cal. 2007); *see Davis v. Am. Broad. Cos.*, 2010 WL 2998476, at *5 (W.D. Mich. July 28, 2010) (permitting judicial notice of "the generic elements of creative works" in copyright case).  Concurrently with this Motion, Buena Vista has filed a request for judicial notice ("RJN").
[143] *Enchant Christmas*, 958 F.3d at 539.
[144] *Stromback*, 384 F.3d at 297.
[145] *Enchant Christmas*, 958 F.3d at 539 (citation, alteration, and internal quotation marks omitted).
[146] Antony Dep. 217:22-24, 221:20-23; *see id.* at 224:13-16 (admitting that "I'm a little bit jumbled on this" sequence of events), 225:6-14 (admitting that "I wouldn't say it matches up

Plaintiff claimed that "the very beginning" of each work involved "a museum and a tour guide," but admitted that his Screenplay actually opened on a Himalayan mountain.[147]  Plaintiff then said each work had a "grandfather" who "gives" his grandson "a round disk that represents his Zodiac power," but admitted that in his Screenplay, though not in *The Zodiac Legacy*, the grandfather transferred zodiac power via a talisman.[148]  (Not mentioned by Plaintiff: that *The Zodiac Legacy*'s grandfather appeared in a dream and gave no tangible object.[149])

Plaintiff described a scene in which characters "drive into an immovable object and then, surprise, they both end up in headquarters," later admitting that the characters were different—a "million year old" man without dragon power in his Screenplay and, in *The Zodiac Legacy*, a younger "female with the powers of the Dragon Zodiac."[150]  (Plaintiff described these scenes at a high level of abstraction because a more concrete comparison is nonsensical:  Plaintiff's million year old drove directly through the wall of a San Francisco water tower,[151] whereas *The Zodiac Legacy*'s female character drove across an icy Greenland plateau and through a garage door.[152])

Plaintiff at first claimed the works shared a "recruitment process" that takes place "all over the world"—also a feature of Stan Lee's *X-Men*—but when asked whether the characters in both works were recruited in the same way, he candidly responded "No."[153]

And while Plaintiff initially claimed that the works had identical endings, he later admitted that, rather than compare the "exact last scene" in his Screenplay and *The Zodiac Legacy*, he was actually comparing an earlier scene "in a sphinx" in his Screenplay against a

---

exactly" and that *The Zodiac Legacy*'s "timing's different"), 231:17-18 (explaining that the purported similarities "do jump around a little bit").
[147] Antony Dep. 217:22-221:1 (also admitting that "[i]t's not exactly the same").
[148] *Id.* at 222:15-223:20.
[149] Stan Lee & Stuart Moore, *The Zodiac Legacy: Convergence* 101-03 (2015).
[150] Antony Dep. 225:6-231:12.
[151] R. 56-1, Ex. 1 at 12-13.
[152] *The Zodiac Legacy: Convergence* at 233-35.
[153] Antony Dep. 233:7-12, 241:8-242:6.

scene, "towards the end of the first book in the three-book series Zodiac Legacy, in a cave."[154]

Again and again, Plaintiff's concocted similarities cannot be found in the works themselves. In any event, this random assemblage of events, presented out of order and without context, does not constitute a "sequence" of events and cannot support a claim of substantial similarity.[155] This is but the tip of the iceberg: Every other similarity between the works that Plaintiff alleged in his Complaint or elsewhere falls apart under scrutiny, either because it does not exist *at all* or because it exists only at an unprotectable level of abstraction.

## 2. The Alleged Similarities Between the Works Are Based on Unprotectable Elements and Must Be Filtered Out.

The Court must filter all of the purported similarities that Plaintiff identifies out of its substantial similarity analysis.

### (a) The Concept of Superheroes with Powers Derived from the Chinese Zodiac Is Not Protectable Expression.

Plaintiff claims that his Works and *The Zodiac Legacy* are substantially similar because they feature superheroes embodying "the powers of the Chinese Zodiac"[156]—albeit to dramatically different effect, as discussed below. It is black-letter law that the bare idea of Chinese zodiac-powered superheroes, and any elements flowing from this premise, are unprotectable.[157] The Court must filter such elements out of its substantial similarity analysis.

---

[154] *Id.* at 248:4-5, 250:3-253:8.

[155] *See, e.g.*, *Green v. Harbach*, 2018 WL 3350329, at *6 (S.D.N.Y. July 9, 2018), *aff'd*, 750 F. App'x 57 (2d Cir. 2019) (rejecting similarity claim based on "supposed plot structures" that "fail to accurately characterize either of the works, and represent rather a strained attempt to impose structure where none is salient, evident, or important to the works on the whole"); *Weller*, 312 F. Supp. 3d at 720 (disregarding "misrepresentations of the works"); *Gable*, 727 F. Supp. 2d at 841-44 (rejecting list of plot points as "random similarities that have no qualitative significance to the works," and thus "not probative of similarity").

[156] *See* R. 48 ¶ 35; Antony Dep. 215:6-10.

[157] *See, e.g.*, *Eng v. Captain Blue Hen Comics*, 2014 WL 2941280, at *2 (E.D.N.Y. June 30, 2014) (rejecting claim that "'idea' of Einstein and other scientists becoming superheroes" was protectable); *Williams v. Crichton*, 84 F.3d 581, 589 (2d Cir. 1996) (rejecting claims of similarity

***Chinese zodiac-powered superheroes***:  As traditionally understood, the Chinese zodiac signs convey real-world character traits to people born under those signs.[158]  Superheroes with powers from the Chinese zodiac are an obvious and unprotectable outgrowth of that concept.[159]

Unsurprisingly, several other works feature Chinese zodiac-powered superheroes.[160]  The show *Jackie Chan Adventures* (which aired while Plaintiff was writing his Works) had characters with Chinese zodiac superpowers.[161]  Plaintiff himself found the show "annoying" because it involved "ideas that are similar to [his]," contrary to his view of his own Works as "original."[162]  Similarly, *Z-Force Zodiac Force*, a cartoon series piloted in 2006, involved a team of "12 young guys" who could transform into Chinese zodiac-powered superheroes.[163]  *The Tiger's Apprentice*, a 2003 novel and forthcoming major motion picture, also brought together a team of powerful Chinese zodiac characters, led by a Chinese-American teenager, to save the world.[164]

As Plaintiff acknowledged, the Western zodiac has also been used in superhero literature, beginning in 1970 with Marvel Comics' Zodiac supervillain team.[165]  Stan Lee and others regularly mined folklore and mythology for superhero stories, including Thor in *The Avengers*.[166]

***Cyclical elements***:  The idea of Chinese zodiac superhero teams that emerge on a cyclical

---

based on elements flowing from "dinosaur zoo" premise); *Brown v. Twentieth Cent. Fox Home Ent.*, 2015 WL 5081125, at *12 (E.D. Ky. Aug. 27, 2015) (holding that similarities between protagonists were "classic scènes à faire flowing from the uncopyrightable idea of a newlywed female and the various difficulties she may face, especially when she is inseminated with an antichrist").

[158] *See* Hull Report at 8, 30; *see also* Antony Dep. 170:7-23 (conceding that the Chinese restaurant placemat referenced by Plaintiff discussed this understanding); Ex. 14.

[159] *See* Hull Report at 27; Hull Dep. 53:13-54:8; *see generally Basile v. Warner Bros. Ent., Inc.*, 2016 WL 5867432, at *7 (C.D. Cal. Jan. 4, 2016) (holding that characters' traits arising from a historical or mythological premise are not protectable).

[160] *See* Hull Report at 22-26 (collecting examples).

[161] *See id.* at 24-25; Hull Dep. 25:10-26:3.

[162] Antony Dep. 176:21-177:19.

[163] *See* Hull Report at 25-26.

[164] *See id.* at 23.

[165] Antony Dep. 182:10-19; *see* Hull Report at 28-29; Moore Dep. 67:15-68:5.

[166] *See, e.g.*, Moore Dep. 64:18-65:25 (collecting examples); *see* Hull Report at 27-29.

basis[167] reflects the Chinese zodiac's cyclical nature, a fact well-known to Plaintiff when he wrote his Works.[168]  Similarly, *Z-Force Zodiac Force* involved superheroes "chosen to carry on the heroic legacy of the Z~Force Power Animal champions from ancient ages."[169]

>    *(b)    Characteristics Derived from Animals Are Not Protectable Expression.*

Plaintiff assigned his characters many powers that derive from the physiognomy, behavior, or common cultural connotations of the animals in question.  Such characteristics "are the common heritage of humankind" and are unprotectable.[170]

**Rat**:  Plaintiff, attempting to concoct a superficial similarity, alleges that his rat character is, among other things, a "traitor" (though the Character Bios and Screenplay make no such claim).[171]  In any event, rats are widely associated with traitorous behavior—as in to "rat on" someone or "to smell a rat."[172]  The traditional origin story of the Chinese zodiac portrays the rat as a devious and untrustworthy figure.[173]

**Ox**:  Plaintiff's ox character is "[e]xtremely strong," with powers that "allow[] him to move almost anything."[174]  Likewise, we describe people as being "as strong as an ox."[175]  Chinese folklore and culture shares this association, and *Jackie Chan Adventures* bestowed super strength upon the bearer of the Chinese zodiac Ox talisman.[176]  Super strength is also a common power in superhero works, as Superman illustrates.[177]

---

[167] R. 48 ¶ 38.
[168] *See* Hull Report at 7-8; Antony Dep. 159:24-161:15.
[169] Hull Report at 25.
[170] *Enchant Christmas*, 958 F.3d at 537-38.
[171] R. 48 ¶ 40; Antony Dep. 145:6-13.
[172] RJN, Exs. D-E; Moore Dep. 87:4-13.
[173] *See* Hull Report at 11.
[174] R. 56-1, Ex. 2 at 102.
[175] RJN, Ex. C.
[176] Hull Report at 11, 25.
[177] Moore Dep. 85:7-10.

***Snake***:  Plaintiff's Character Bios give his snake character the "power to contort her body *like a snake*," which Plaintiff described as akin to a boa constrictor's ability to "choke" prey.[178] His snake character can also control snakes—a callback to traditional snake charming and to the hypnotic snakes in *The Jungle Book*, *Robin Hood*, and *Aladdin*.[179]

***Horse***:  Plaintiff's horse character has, by Plaintiff's own admission, the "speed and endurance *of a wild horse*"—which he characterized as his "unique expression."[180]  Not so:  We bet on racehorses and praise those who have a lot of "horsepower," "work[] like a horse," or are "as strong[] as a horse."[181]  Famous horses of incredible speed and endurance exist throughout Chinese folklore, and speedy superheroes are historically plentiful.[182]

***Ram:***  Plaintiff's Works feature a ram character that is prone to ramming buildings and people with his head.[183]  A "battering ram" is both literally and figuratively an immensely destructive device, and the term connotes strength and power.[184]

***Rooster***:  Plaintiff's rooster character has a "[s]onic field" weapon.[185]  The natural superpower for a rooster superhero is an exaggerated version of its most representative characteristic: its powerful "cock-a-doodle-doo."  Indeed, in Chinese culture the rooster's crow is associated with the power to dispel darkness and the dead.[186]

***Dragon***:  Plaintiff's dragon character is a powerful martial artist, among other characteristics.[187]  This reflects the centuries-old association between dragons and power in

---

[178] R. 56-1, Ex. 2 at 99 (emphasis added); Antony Dep. 143:18-144:2.
[179] *See* Marsham Dep. 75:20-24; *see also* Hull Dep. 41:17-22.
[180] R. 56-1, Ex. 2 at 98 (emphasis added); *see* Antony Dep. 142:13-143:15.
[181] RJN, Exs. A-B.
[182] *See* Hull Report at 13; Moore Dep. 84:21.
[183] *See* R. 56-1, Ex. 1 at 40.
[184] RJN, Exs. F-G.
[185] R. 56-1, Ex. 1 at 39; Antony Dep. 141:5-15.
[186] Hull Report at 14.
[187] R. 56-1, Ex. 2 at 98; Antony Dep. 142:5-6.

Chinese culture and the well-worn connection between dragons and the martial arts, as exemplified by the classic Bruce Lee kung fu films *Enter the Dragon* and *The Way of the Dragon*.[188] Plaintiff, indeed, was inspired by Bruce Lee when writing his Screenplay.[189]

>     (c)     Use of the *"Hero's Journey"* Plot Is Not Protectable Expression.

Plaintiff suggests that both his Screenplay and *The Zodiac Legacy* feature characters who receive their "heritage" in the form of a round "talisman from their grandfather" that is allegedly "attached to Zodiac Power."[190] The gift supposedly catapults the characters into a hidden world, where they must "confront their inner fears and the normal conflicts associated with growing up" while grappling with their newfound superpowers.[191] The facts do not support Plaintiff's account, as discussed above.[192] But Plaintiff's Works also embody the unprotectable Hero's Journey trope, a "literary staple" involving "a humble hero with a previously unknown powerful ancestry who learns his true identity and must save his home."[193] Stories of this type often involve a grandfatherly figure who reveals the young hero's birthright with the gift of a magical talisman, as when Obi-Wan Kenobi gives the teenaged Luke Skywalker his father's lightsaber.[194]

>     (d)     Common Tropes in the Superhero, Fantasy, and Science Fiction
>             Genres Are Not Protectable Expression.

Other elements that Plaintiff encourages the Court to consider are common to the superhero, fantasy, and science fiction genres, and must be filtered out.

**Recruitment process**: As discussed above, Plaintiff conceded that his Screenplay and *The*

---

[188] Hull Report at 12.

[189] Antony Dep. 119:15-23.

[190] R. 48 ¶¶ 37, 42-43; *see* Antony Dep. 222:12-223:20.

[191] R. 48 ¶¶ 20-21.

[192] *See supra* Part IV(D)(1).

[193] *Basile*, 2016 WL 5867432, at *6, 8 (collecting examples).

[194] *See, e.g.*, *Twentieth Century Fox Film Corp. v. Marvel Enters., Inc.*, 155 F. Supp. 2d 1, 41 (S.D.N.Y. 2001) (taking judicial notice of the "nurturing of the gifted Luke Skywalker by Obi-Wan ('Ben') Kenobi"); *Davis*, 2010 WL 2998476, at *8 (describing "Yoda, Headmaster Dumbledore, Obi-Wan or Gandalf" as part of "a *scene a faire* to the spirit-hero genre").

*Zodiac Legacy* do not share the same recruitment storyline.[195]  This "generalized plot scenario"—involving "seek[ing] out young [heroes], train[ing] them to use their powers, and protect[ing] them from" villains "who seek to control them"—is "common to fiction."[196]  It appears in superhero works like Stan Lee's *X-Men*, in which Professor Xavier identifies and recruits gifted mutants from around the world.[197]

*Special team plane/headquarters*:  Plaintiff also cites as similarities a team "headquarters" and a "special team plane"—a "jetcopter" with "stealth mode."[198]  Neither concept is protectable:  "Sanctuaries are . . . commonly used by teams of superheroes."[199]  And the "use of flying transports" (including jet-powered helicopters) is "neither original nor protectible."[200]

*High-tech elements*:  Plaintiff makes vague references to high-tech gadgetry and technobabble in both works,[201] but that is common in the superhero genre.  Teleportation, for example, is ubiquitous,[202] including in Stuart Moore's past work.[203]  The "concept of a person, animal, or thing that can disappear from one location and magically appear elsewhere" is "not a

---

[195] *See supra* Part IV(D)(1).
[196] *Twentieth Century Fox*, 155 F. Supp. 2d at 41 (discussing *X-Men*).
[197] *See* Marsham Dep. 38:1-17; Moore Dep. 58:15-25.
[198] R. 48 ¶ 42; Antony Dep. 246:15-247:22.
[199] *Twentieth Century Fox*, 155 F. Supp. 2d at 42-43 (citing, as examples, *X-Men*, *Avengers*, and *Fantastic Four*); Moore Dep. 63:18-64:17 (collecting examples, including from Lee's oeuvre).
[200] *Althouse v. Warner Bros. Ent.*, 2014 WL 2986939, at *4 (C.D. Cal. Apr. 28, 2014); *see also Twentieth Century Fox*, 155 F. Supp. 2d at 41 (collecting examples); *see* Moore Dep. 62:22-63:17 (describing past superhero works with flying transports).
[201] R. 48 ¶ 42.
[202] Captain Kirk and First Officer Spock teleport from the Starship Enterprise; the wizards of *Harry Potter* jump between locations using Floo Powder, Portkeys, and apparition; and the Pevensie children enter Narnia through their magical wardrobe.  *See, e.g.*, *Cap. Recs., LLC v. ReDigi Inc.*, 934 F. Supp. 2d 640, 645 n.2 (S.D.N.Y. 2013) (discussing the "Star Trek transporter . . . and Willy Wonka's teleportation device, Wonkavision").
[203] Moore Dep. 92:18-25.

protectable element."[204]  And high-tech material and "techie" characters are "as a practical matter indispensable, or at least standard," in superhero works (including by Stan Lee) and are thus "exclude[d from] copyright protection.[205]

**Names:**  Plaintiff contends that the name Steven Lee (a portmanteau of Steve Voccola and Stan Lee) mimics the name of his much-different character Steve Fin,[206] but a name "is an unprotectible generic element of a work."[207]

> (e)  *Generic Themes in Plaintiff's Works Are Not Protectable Expression.*

Other elements that Plaintiff cites either do not exist at all or are unprotectable, and must be filtered out. Plaintiff says his Screenplay and *The Zodiac Legacy* both "invoke the idea of chaos vs. order"[208]—a biblical trope and the type of common "theme[], such as saving the world, [and] the battle between good and evil," that does not qualify for copyright protection.[209]

Plaintiff asserts that in both works, a "good" team of "teenagers from different countries" battles an "evil team" "comprised of deadly, more experienced, adult characters."[210]  This "common storyline," in which "the protagonists fight and defeat the villains," "is not actionable as it is a scène[ ]-à-faire common to superhero works, as well as many other genres."[211]  And

---

[204] *Wild v. NBC Universal, Inc.*, 2011 WL 13272427, at *9 (C.D. Cal. June 28, 2011) (citing *Harry Potter*, *Star Trek*, and *Lost*).
[205] *Stromback*, 384 F.3d at 296.  Stan Lee's past work "very heavily" featured high-tech gadgetry, as does Stuart Moore's.  Moore Dep. 66:1-67:8.  Countless other examples exist: Batman's utility belt, his savvy butler Alfred, and his Batmobile, a vehicle "equipped with futuristic weaponry and technology that is 'years ahead of anything else on wheels,'" *DC Comics v. Towle*, 802 F.3d 1012, 1015 (9th Cir. 2015); James Bond's "technologically advanced gadgets," vehicles, and colleague Q, *Danjaq, LLC v. Universal City Studios, LLC*, 2014 WL 7882071, at *1 (C.D. Cal. Oct. 2, 2014); and more.
[206] R. 48 ¶ 36.
[207] *Davis*, 2010 WL 2998476, at *10.
[208] R. 48 ¶ 42.
[209] *Stromback*, 384 F.3d at 297.
[210] R. 48 ¶¶ 21, 35, 42-43; Antony Dep. 242:19-23 (contending that "kids fighting adults is protected expression original to" Plaintiff).
[211] *Kaye v. Cartoon Network, Inc.*, 297 F. Supp. 3d 362, 368 (S.D.N.Y. 2017).

teams of superheroes (often teenagers) are common in the genre. *Zodiac Legacy* author Stan Lee famously created international superhero teams like *The Avengers* and *X-Men*[212]—which Plaintiff explicitly described as a forerunner of his Works[213]—as did author Stuart Moore.[214] Plaintiff likened his Works to *Teenage Mutant Ninja Turtles* and *Power Rangers*, both teams of teenagers.[215] Other superhero works involving the Chinese zodiac also feature teams.[216]

Finally, Plaintiff points to "tension between characters from countries with historic rivalries."[217] This obfuscates the fact that, while Plaintiff's Screenplay plays on enmity between Israel and Egypt, *The Zodiac Legacy* does not. In any case, "interpretations of historical events, including theories or plots, are not protectable under the Copyright Act,"[218] and similar books and films often draw on geopolitical tensions. The *Harry Potter* series, for example, adopts Cold War themes, locating dark magic in Eastern Europe and the forces of good in the United Kingdom; *Captain America* and *X-Men* explicitly draw on the divisions of World War II.

### 3. After Filtration, a Comparison of the Works Reveals No Similarity.

After excluding unprotectable elements, the Court is "left with two works that are completely dissimilar in both their overall look and feel and in their constituent expressive elements"[219]—an unsurprising result, given that *The Zodiac Legacy* is an illustrated book trilogy

---

[212] *See, e.g.*, Moore Dep. 58:15-61:7; Antony Dep. 206:20-21 ("X-Men is a Marvel superhero group.")
[213] Antony Dep. 138:14-21; Exh. 11 at ANT000327 (calling his Screenplay "the X-Men for the Yugio age").
[214] Moore Dep. 57:4-58:3, 61:8-23.
[215] Antony Dep. 138:14-21; Exh. 11 at ANT000327.
[216] *See* Hull Report at 22-26.
[217] R. 48 ¶¶ 38, 42.
[218] *Crane v. Poetic Prods. Ltd.*, 593 F. Supp. 2d 585, 596 (S.D.N.Y. 2009), *aff'd*, 351 F. App'x 516 (2d Cir. 2009); *see Hobbs v. John*, 722 F.3d 1089, 1095 (7th Cir. 2013) (the mere "idea of an impossible love affair" due to Cold War tensions is not protectable).
[219] *Stromback*, 384 F.3d at 297.

for children that is over 15 times as long as Plaintiff's more adult-oriented Screenplay.[220]

**Role of the Chinese zodiac**:  In *The Zodiac Legacy*, zodiac power is omnipresent, residing in every living person and especially concentrated in an ancient set of pools.[221]  Beams of light shoot through the atmosphere and transmit the zodiac powers to human hosts—including unsuspecting teenagers selected by the powers themselves.[222]  A single person can hold multiple powers, multiple people can share the same power, and individual powers can be captured from, or transferred between, people.[223]  The powers are not created equal.  The Dragon power, for example, is stronger than the others combined—so strong that it can overtake its human host.[224]

None of this exists in Plaintiff's Works, which frame zodiac powers as superpowers transferable via talismans, not as a life-force permeating and shaping the entire world.[225]

**Plot/story arc**:  Set against these distinct backdrops are two fundamentally different storylines.[226]  *Convergence*, the first *Zodiac Legacy* book, unfolds in four parts.[227]  It opens with Maxwell unleashing the 12 zodiac powers from the ancient pools.  He absorbs six powers and transfers them to members of the Vanguard, his private army.  He and Jasmine tussle over, and eventually split, the seventh and strongest power (Dragon).  The remaining five powers, shooting out as beams of light, strike unsuspecting teenagers around the world.  The next quarter of the

---

[220] *See* Antony Dep. 220:22-25 (noting, in the context of discussing a purported plot similarity, that *The Zodiac Legacy* "has . . . illustrations and . . . is a novel," whereas Plaintiff's Screenplay "is a screenplay.  So it's . . . not exactly the same").

[221] *The Zodiac Legacy: Convergence* 49-50.

[222] *See, e.g.*, *id.* at 41,43.

[223] *See, e.g.*, *id.* at 73-74.

[224] *See, e.g.*, *id.* at 343-48.

[225] R. 56-1, Ex. 1 at 23.

[226] *See Benay v. Warner Bros. Ent., Inc.*, 607 F.3d 620, 625-26 (9th Cir. 2010), *overruled on other grounds by Skidmore ex rel. Randy Craig Wolfe Trust v. Led Zeppelin*, 952 F.3d 1051, 1069 (9th Cir. 2020) (rejecting claim of similarity where works "tell very different stories"); *Weller*, 312 F. Supp. 3d at 725 (finding no similarity where any "common elements are standard in thrillers and at the level of particular expression . . . tell very 'different stories'").

[227] *See generally The Zodiac Legacy: Convergence*.

book covers Maxwell and Jasmine's globetrotting race to recruit the five Zodiac teenagers to their respective sides. The third quarter recounts Jasmine's training of the Zodiac teenagers at her Greenland headquarters, Maxwell's unsuccessful kidnapping attempt, and the Zodiac teenagers' gradual development into a cohesive team. The final quarter depicts Maxwell and Jasmine's battle over the Dragon power; the Zodiac teenagers save Jasmine and defeat Maxwell.

After *Convergence* comes two more volumes. *The Dragon's Return* describes the slow defection of Maxwell's Vanguard villains to the good side, as Maxwell fights to seize all of the zodiac powers for himself.[228] Maxwell ultimately takes the Dragon power for himself, while capturing and hiding away the powers held by others. In *The Balance of Power*, the combined Zodiac/Vanguard team discovers that the Dragon is now using Maxwell as its human host as it seeks to destroy humanity and control the world.[229] The Dragon designs sophisticated technology to control plate tectonics and set off volcanic eruptions around the Ring of Fire, hoping to kill off a large percentage of the world's population. The Zodiac/Vanguard team, led by Steven Lee, battles to regain their zodiac powers and defeat the Dragon. In the final fight, Maxwell and Jasmine sacrifice themselves to trap the Dragon power, and humanity is saved.

Plaintiff's Screenplay tells a completely different tale. Lin Ching, the evil ancient being, escapes after being banished to a "nether dimension" by his cousin Lee Ching; this "created a rip in the heavens, unbalancing the forces that stabilize this planet and the universe" and prompting natural catastrophes.[230] Lin Ching builds an evil army of zodiac-powered "clones."[231] Seeking to plunge the world into chaos, Lin Ching sows discord between Egypt and Israel and attempts to spark World War III by framing Israel for various attacks on Egyptian institutions.[232]

---

[228] *See generally* Stan Lee & Stuart Moore, *The Zodiac Legacy: The Dragon's Return* (2017).
[229] *See generally* Stan Lee & Stuart Moore, *The Zodiac Legacy: The Balance of Power* (2017).
[230] R. 56-1, Ex. 1 at 26.
[231] *Id.* at 25.
[232] *Id.* at 50.

Meanwhile—in a sequence of events that Plaintiff concedes is different from *The Zodiac Legacy*[233]—Lee Ching assembles an army, ZR-12, by transmitting himself to various locales via television, billboards, cell phones, and cereal boxes.[234] ZR-12 faces off against Lin Ching's clones to prevent nuclear war from destroying the world. Never do the teams merge, as in *The Zodiac Legacy*. Nor do any characters nearly succumb to the overwhelming strength of their respective powers, or give their lives to save humanity from the zodiac power itself.

*Characters*: Plaintiff's claims that the works contain similar characters are illusory. Whereas his Works feature 12 zodiac-powered superheroes and 12 evil clones, *The Zodiac Legacy* features only 13 characters (good and evil) with zodiac powers, with 11 holding the full powers of a zodiac sign and two sharing the Dragon power.[235] Plaintiff's Works include two ancient beings and their assistants—characters that have no analogue in *The Zodiac Legacy*.[236]

More broadly, as set forth in Appendix A, Plaintiff declines to mention that the allegedly parallel characters have contrasting allegiances, hail from different countries, are of different genders, have different powers, or relate to different Zodiac signs,[237] or that these characters "play different roles in the overall scheme of the book."[238] For example, Plaintiff describes both works as having an "Asian-American teenage protagonist," supposedly Steven Lee in *The Zodiac Legacy* and Tommy Hoto in his Screenplay.[239] But Tommy Hoto is a Japanese American who acquires the dragon power from his grandfather,[240] whereas the Chinese-American Steven Lee unexpectedly acquires the tiger power from the zodiac pools—as Plaintiff admits, not from any

---

[233] Antony Dep. 242:1-6.
[234] R. 56-1, Ex. 1 at 21.
[235] *See* App'x A, Table 1.
[236] *See* App'x A, Table 4.
[237] *E.g.*, Antony Dep. 240:18-241:6 (describing Plaintiff's rabbit and *The Zodiac Legacy*'s pig characters as similar solely because they have "power over computers"), 387:4-389:25.
[238] *Green*, 2018 WL 3350329, at *6.
[239] R. 48 ¶ 36; *see* Antony Dep. 222:15-21.
[240] R. 56-1, Ex. 1 at 10, 17-18.

talisman given by his late grandfather.[241]  Nor does Steven Lee parallel Plaintiff's tiger character, an Indian princess destined for an unhappy arranged marriage.[242]

When asked to identify which character was analogous to *The Zodiac Legacy*'s Jasmine, a young Chinese woman with half of the Dragon power, Plaintiff cited Lee Ching (an ancient being), Tommy Hoto, and a clone character, then denied that she was copied from any of them.[243] Similarly, he acknowledged that his Irish character did not share the same Zodiac sign or powers (or country of origin) as *The Zodiac Legacy*'s Northern Irish character.[244]  Courts consistently reject attempts to "mix and match characters" based on cherry-picked character traits.[245]

***Mood and dialogue***:  *The Zodiac Legacy*, a 1,500-page trilogy targeting children, is starkly different in mood and dialogue from Plaintiff's Screenplay, which involves such adult subject matter as Nazi concentration camps.[246]  Plaintiff failed to identify overlapping dialogue at his deposition; the only example he offered was, in his words, not "exact."[247]

## V.     CONCLUSION

Buena Vista respectfully requests that the Court grant summary judgment in favor of Buena Vista on Plaintiff's copyright infringement claim.

---

[241] Antony Dep. 221:20-223:20; *see* Moore Dep. 76:7-77:1.
[242] R. 56-1, Ex. 2 at 100.
[243] Antony Dep. 228:4-231:12.
[244] *Id.* at 239:2-240:12.
[245] *Green*, 2018 WL 3350329, at *6; *see Benay*, 607 F.3d at 626-27; *Weller*, 312 F. Supp. 3d at 720-21.
[246] *E.g.*, *Benay*, 607 F.3d at 628 (rejecting similar claims); *Weller*, 312 F. Supp. 3d at 724-25 (same); *Gable*, 727 F. Supp. 2d at 847-48 (same).
[247] Antony Dep. 253:9-25.

Respectfully submitted,

/s/ *Robert B. Craig*
Robert B. Craig

Robert B. Craig (15590)
TAFT STETTINIUS & HOLLISTER, LLP
50 East Rivercenter Blvd., Suite 850
Covington, KY 41011
Tel: (859) 547-4300; craigr@taftlaw.com

Glenn D. Pomerantz (*pro hac vice*)
Erin J. Cox (*pro hac vice*)
Usha C. Vance (*pro hac vice*)
Shannon Aminirad (*pro hac vice*)
MUNGER, TOLLES & OLSON LLP
350 S. Grand Avenue, 50th Floor
Los Angeles, CA 90071-3426
Tel: (213) 683-9100; glenn.pomerantz@mto.com,
erin.cox@mto.com, usha.vance@mto.com;
shannon.aminirad@mto.com

*Counsel for Defendant Buena Vista Books, Inc.*