**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**AT COVINGTON**

**CIVIL ACTION NO. 18-205-DLB-CJS**

**JOHN ANTONY**                                                                    **PLAINTIFF**

**v.**                           **MEMORANDUM OPINION AND ORDER**

**BUENA VISTA BOOKS, INC.**                                         **DEFENDANT**

**\*\*\* \*\*\* \*\*\* \*\*\***

This matter is before the Court upon six Motions filed by Defendant Buena Vista Books, Inc.: (1) the Motion to Exclude Testimony of Proffered Expert Cedar Boschan ("Motion to Exclude") (Doc. # 129); (2) the Motion for Summary Judgment (Doc. # 130); (3) the Request for Judicial Notice in Support of Motion of Summary Judgment ("Motion for Judicial Notice") (Doc. # 131); and (4) three Motions to Continue Under Seal Certain Documents ("Motions to Continue Under Seal") (Docs. # 142, 153, and 161). The Motions have either been fully briefed or the deadline for filing responses has expired. They are therefore ripe for review.[1] For the following reasons, the Motions for Judicial Notice, for Summary Judgment, and to Continue Under Seal are each **granted**, and the Motion to Exclude is **denied as moot**.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

This is a copyright infringement action brought by Plaintiff John Antony against Defendant Buena Vista Books, Inc., stemming from Disney Book Group, LLC's ("DBG")

---

[1]     Although Defendant has requested oral argument on its Motion for Summary Judgment, because the current record is sufficient to decide the Motion, the Court concludes oral argument is not warranted.

publication of *The Zodiac Legacy*, a series of young adult novels that Plaintiff alleges are based on his original works.  (*See* Doc. # 130-1 at 6).[2]  Plaintiff is an individual and resident of Campbell County, Kentucky.  (Doc. # 48 ¶ 10).  Defendant is a California corporation that produces, acquires, licenses, and distributes novels, motion pictures, and other works.  (*Id.* ¶ 11).  Effective January 31, 2020, DBG assigned and transferred all of its rights and interests in *The Zodiac Legacy* to Defendant.  (Doc. # 45 at 2).

Central to this action is a 91-page screenplay and accompanying handwritten character biographies that Plaintiff began working on in 2000 and allegedly finished in 2005 (the "Works").  (*See* Doc. # 130-1 at 14-16).  Broadly speaking, the screenplay, entitled *Zodiac Regiment Twelve*, tells the story of twelve children from countries across the world who are bestowed with superpowers aligned with the animal symbols of the Chinese zodiac.  (*See* Doc. # 48 ¶ 20).  Plaintiff was first inspired to write the Works after seeing a placemat in a Chinese restaurant featuring information on the Chinese zodiac, and he drew inspiration from his past martial arts experience and interest in Bruce Lee. (Doc. # 130-1 at 13-14).

In October 2006, Plaintiff traveled to Los Angeles, California to attend an event called Screenwriting Expo 5 (the "Event"), which was described as a "pitchfest for aspiring writers."  (Doc. # 130-1 at 15) (internal quotation marks omitted).  Plaintiff aimed to pitch the Works to individuals in the entertainment industry with the hope that he would be hired as a screenwriter, the Works would be licensed by one the companies, and/or the Works would ultimately be produced into a film.  (*See* Doc. # 154 at 2).  Although Plaintiff met

---

[2]    The parties largely agree on the basic facts of the case.  For brevity and clarity, the Court will primarily refer to the Motion for Summary Judgment and/or the Second Amended Complaint (Doc. # 48) for the facts, except where necessary to elaborate on disagreements.

with representatives from several companies, he testified at his deposition that the "whole reason" he attended the Event was to meet with a representative from The Walt Disney Company ("Disney"), DBG's parent company.  (Doc. # 132-1 at 65, 75).  He also testified that he brought approximately 20 typewritten copies of the Works with him to distribute at the Event.  (Doc. # 132-1 at 72).

According to Plaintiff, no representative from Disney was initially available to meet with him.  (*Id.* at 65).  However, Plaintiff kept "checking back" to see if a Disney representative was available, and eventually, "lo and behold, Disney was available[.]"  (*Id.* at 65-66).  Plaintiff testified that he met with a woman who was a Disney representative but could not recall her name.  (*Id.* at 63).  Plaintiff testified that he left copies of the Works with the Disney representative.  (*Id.* at 73).  Plaintiff also testified that he left copies of the Works with representatives of other entertainment companies.  (*Id.* at 74).  Plaintiff acknowledged that he did not retain a copy of the version of the Works that he brought with him to the Event.  (*Id.* at 85).

In early 2016, Plaintiff discovered that DBG had published *The Zodiac Legacy*. (Doc. # 48 ¶ 31).  After purchasing and reading the first book in the series, entitled *The Zodiac Legacy: Convergence*, Plaintiff allegedly "discovered that [Defendant] had copied his work."  (*Id.*).  According to Plaintiff, "*The Zodiac Legacy* series not only copies the concept of [the Works], but it also employs a majority of the same key plot elements, character devices, and story arc, cover to cover."  (*Id.* ¶ 32).

On October 3, 2018, Plaintiff registered copyrights for the Works with the United States Copyright Office (the "Copyright Office").  (*See* Doc. # 48-1).  On December 17, 2018, Plaintiff initiated this action by filing his Complaint, which asserted one count of

copyright infringement against Disney Enterprises, Inc. ("DEI"), a subsidiary of Disney. (*See* Doc. # 1 ¶¶ 50-66).   On October 28, 2019, the Court issued an agreed order substituting DBG as the defendant in this action.  (Doc. # 38).  On June 8, 2020, the Court issued another agreed order substituting Defendant as the defendant in this action.  (Doc. # 46).  On June 19, 2020, Plaintiff filed a Second Amended Complaint which reflected the party changes.  (Doc. # 48).

On October 22, 2020, Defendant filed the Motion to Dismiss Pursuant to Rule 12(b)(6) ("Motion to Dismiss").  (Doc. # 52).  After a full round of briefing (Docs. # 56 and 61), the Court issued a Memorandum Opinion and Order denying the Motion to Dismiss. (*See* Doc. # 65).  In so doing, the Court determined that Plaintiff had stated a plausible claim of copyright infringement, which is all that was required at that procedural posture. (*See id.*).   The Court implicitly acknowledged, however, that Plaintiff's claim might fail under the "more scrutinous factual evaluation" appropriate at the summary judgment stage.  (*See id.* at 5).  Defendant then filed its Answer (Doc. # 66), and the case proceeded through discovery.  (*See* Docs. # 69 and 104).

On September 28, 2023, Defendant filed the Motion to Exclude, the Motion for Summary Judgment, and the Motion for Judicial Notice.  (Docs. # 129, 130, and 131). Defendant respectively filed the Motions to Continue Under Seal on October 10, 2023, November 3, 2023, and November 22, 2023.  Plaintiff filed Responses to the Motion to Exclude and the Motion for Summary Judgment (Docs. # 149 and 154) but did not respond to the Motion for Judicial Notice or the Motions to Continue Under Seal. Defendant filed Replies as appropriate (Docs. # 157 and 166).

## II.     ANALYSIS

### A.     Standard of Review

Defendant has moved for summary judgment on Plaintiff's sole claim of copyright infringement.  (Doc. # 130).  Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In deciding a motion for summary judgment, the court must view the evidence and draw all reasonable inferences in favor of the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"The moving party bears the burden of showing the absence of any genuine issues of material fact."  *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 483 (6th Cir. 2008).  The movant may do so by "citing to particular parts or materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials[.]"  Fed. R. Civ. P. 56(c)(1)(A).  Once the movant has satisfied its burden, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita*, 475 U.S. at 586.  It must produce evidence showing that a genuine factual issue remains.  *Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 934 (6th Cir. 2000).  If, after reviewing the record as a whole, a rational fact finder could not find for the nonmoving party, summary judgment should be granted.  *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 349 (6th Cir. 1998).

Moreover, the trial court is not required to "search the entire record to establish that it is bereft of a genuine issue of material fact."  *Street v. J.C. Bradford & Co.*, 886

F.2d 1472, 1479-80 (6th Cir. 1989).  Rather, the "nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact."  *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001).

### B.    Analysis

The Court will address the Motion for Judicial Notice, the Motion for Summary Judgment, the Motion to Exclude, and the Motions to Continue Under Seal in turn.

#### 1.    *Motion for Judicial Notice*

Defendant requests that the Court take judicial notice of certain dictionary entries as well as "common or generic literary, cultural, or creative elements" referenced in the Motion for Summary Judgment.  (Doc. # 131 at 1).   The dictionary entries, which Defendant attaches as Exhibits A through G to the Motion for Judicial Notice, come from the Third Edition of the Oxford English Dictionary and contain the definitions of words such as "horse," "horsepower," and "ox."  (*See id.*).  The literary, cultural, and creative elements include: (a) common tropes in the superhero and science fiction genres (*e.g.*, a battle between good and evil) and (b) the plots, characters, and themes of well-known books, films, and television shows such as *X-Men*, *Teenage Mutant Ninja Turtles*, *Star Wars*, and the *Harry Potter* series.  (*See* Doc. # 130-1 at 29-36).

Rule 201 of the Federal Rules of Evidence authorizes courts to take judicial notice of facts that are "not subject to reasonable dispute because" they are "generally known within the trial court's territorial jurisdiction" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  Courts routinely take judicial notice of dictionary entries as they "are not subject to

reasonable dispute." *LSC, LLC v. Fitness & Sports Clubs, LLC*, Civil Case No. 5:15-cv-134-JMH, 2015 WL 5194581, at *2 n.2 (E.D. Ky. Sept. 4, 2015) (citing *Comerica Bank v. Lexington Ins. Co.*, 3 F.3d 939, 944 (6th Cir. 1993)).  Courts may also take judicial notice of "the generic elements of creative works." *Davis v. Am. Broad. Cos., Inc.*, No. 1:10-CV-167, 2010 WL 2998476, at *5 (W.D. Mich. July 28, 2010).  This includes the plots, characters, and themes of well-known books, films, and other mass media properties. *See, e.g., id.* at 8 (Referencing Spiderman, Batman, Superman, Luke Skywalker, Hobbits, and Buffy the Vampire Slayer).

Upon review, the Court grants the Motion for Judicial Notice.  The Exhibits that Defendant attaches thereto appear to be true and correct copies of the relevant definitions from the Third Edition of the Oxford English Dictionary and are thus not subject to reasonable dispute.  And the literary, cultural, and creative elements cited by Defendant appear to accurately reflect common media tropes and the plots and characters of well-known media properties.  Moreover, the Court notes that Plaintiff did not file any response to the Motion for Judicial Notice, which constitutes a separate reason for granting it. *See* L.R. 7.1(c) ("Failure to timely respond to a motion may be grounds for granting the motion.").  Based on the above, the Motion for Judicial Notice (Doc. # 131) is **granted**.

## 2.   *Motion for Summary Judgment*

Defendant moves for entry of summary judgment on Plaintiff's sole claim of copyright infringement.  (Doc. # 130).  In support, Defendant argues that (i) Plaintiff failed to obtain a valid copyright registration for the version of the Works that Defendant allegedly accessed and copied; (ii) Plaintiff failed to show that the creators of *The Zodiac Legacy* had access to the Works; (iii) the Works and *The Zodiac Legacy* are not

substantially similar in protected expression; and (iv) *The Zodiac Legacy* was independently created.  (*See id.*).  As discussed above, the parties appear to largely agree on the basic facts of the case.  But even considering the parties' apparent disagreements about the facts, the Court concludes that entry of summary judgment in Defendant's favor is appropriate.  Indeed, for the reasons stated below, Defendant is entitled to judgment as a matter of law even assuming the truth of Plaintiff's version of the facts.  The Court will address each of Defendant's arguments in turn.

> **a.    The Court will not determine whether Plaintiff's alleged failure to obtain copyright registrations over the version of the Works brought to the Event warrants entry of summary judgment**

Defendant first argues that Plaintiff did not secure a valid copyright registration for the version of the Works that he brought to the Event, which is "the sole version [of the Works] that he alleges *The Zodiac Legacy*'s creators accessed."  (Doc. # 130-1 at 13).  According to Defendant, Plaintiff's failure to obtain these copyright registrations "dooms his claim, entitling [Defendant] to summary judgment."  (*Id.*).

The Copyright Act provides, in pertinent part, that "no civil action for infringement of [a] copyright in any United States work shall be instituted until preregistration or registration of the copyright claim has been made" with the Copyright Office.  17 U.S.C. § 411(a).  To obtain copyright registration in the case of an unpublished work, an applicant must deposit with the Copyright Office "one complete copy" of the work.  17 U.S.C. § 408(b)(1).  "[Section] 408 permits the deposit of bona fide copies of the original only[,]" meaning that the copy deposited "must be virtually identical to the original and must have been produced by directly referring to the original."  *Coles v. Wonder*, 283 F.3d 798, 802 (6th Cir. 2002) (quoting *Kodadek v. MTV Networks, Inc.*, 152 F.3d 1209, 1212 (9th Cir.

1998)) (internal quotation marks omitted).  The Sixth Circuit recently affirmed a district court's granting of summary judgment to a defendant where the plaintiff "failed to establish the prerequisites to suit—copyright registration and deposit[.]"  *Parker v. Hinton*, No. 22-5348, 2023 WL 370910, at *1 (6th Cir. Jan. 24, 2023).

Although Plaintiff allegedly finished the relevant version of the Works sometime in 2005, he waited until October 3, 2018 to register them with the Copyright Office.  (*See* Doc.48-1).  According to Plaintiff, the version that he brought to the Event was "a typed, copyedited, and generally cleaned up version" of that which he deposited with the Copyright Office.  (Doc. # 56-1 ¶ 5).  He also admits that he no longer has "an exact copy" of the version of the Works he brought to the Event.  (Doc. # 56-1 ¶ 6).  However, Plaintiff submits that the version he brought to the Event was "wholly derived" from the version he deposited with the Copyright Office.  (*Id.* ¶ 5).

Based on Plaintiff's submissions, the Court doubts whether the version of the Works Plaintiff deposited with the Copyright Office was a "bona fide" copy of the version that Defendant allegedly accessed.  Indeed, Plaintiff expressly acknowledges that the versions were not identical to one another.  However, the Court need not decide this issue to resolve the Motion for Summary Judgment.  This is because, as stated below, Defendant is entitled to summary judgment for reasons unrelated to Plaintiff's depositing of the Works with the Copyright Office.

### b. Plaintiff fails to show legally sufficient evidence that the *The Zodiac Legacy*'s creators had access to the Works

Defendant next argues that Plaintiff has no evidence that *The Zodiac Legacy*'s creators had access to the Works.  (Doc. # 130-1 at 22-25).  Before addressing this argument, the Court must first outline the basic elements of copyright infringement.

A "plaintiff must prove two things in order to establish a copyright infringement claim: first, that he had ownership of a valid copyright; second, that another person copied a protected interest in the work." *Coles*, 283 F.3d at 801. Because "[d]irect evidence of copying is rare," plaintiffs frequently "will attempt to establish an inference of copying by showing (1) access to the allegedly-infringed work by the defendant(s) and (2) a substantial similarity between the two works at issue." *Ellis v. Diffie*, 177 F.3d 503, 506 (6th Cir. 1999). The Sixth Circuit has acknowledged that "in some cases[,] the relationship between the degree of proof required for similarity and access may be inversely proportional: where the similarity between the two works is strong, less compelling proof of access may suffice, and vice-versa." *Stromback v. New Line Cinema*, 384 F.3d 283, 293 (6th Cir. 2004). With this framework in mind, the Court will address Defendant's substantive arguments.

Access means having a reasonable opportunity to view the Works "and thus having the opportunity to copy." *See Ellis*, 177 F.3d at 506. Neither "[a] mere assertion of access, unsupported by probative evidence[,]" nor "a bare possibility of access [is] sufficient." *Murray Hill Publ'ns, Inc. v. Twentieth Century Fox Film Corp.*, 361 F.3d 312, 316 (6th Cir. 2004). "Several Circuit Courts, including the Sixth, have rejected bare corporate receipt as sufficient proof of access, requiring plaintiffs to introduce some evidence that it was reasonably possible that the paths of the infringer and the infringed work crossed." *Design Basics, LLC v. Forrester Wehrle Homes, Inc.*, Case No. 3:15CV00666, 2018 WL 1583103, at *18 (N.D. Ohio Mar. 30, 2018) (quoting *Jones v. Blige*, 558 F.3d 485, 493 (6th Cir. 2009)) (internal quotation marks omitted). That said, access generally "is intended to be easily established in light of the inherent difficulty of

proving actual copying." *Frank Betz Assocs., Inc. v. J.O. Clark Constr., L.L.C.*, Civil Action No. 3:08-cv-00159, 2010 WL 2253541, at *14 (M.D. Tenn. May 30, 2010).

Plaintiff's main theory of access in this case is as follows.  During his deposition, Plaintiff testified that he met with a Disney representative at the Event but could not recall her name.  (Doc. # 132-1 at 63).  According to Plaintiff, the Disney representative with whom he met was "rude," "leaned toward Asian[,] . . . [had] dark brown hair[, and] . . . [a] [d]arker complexion."  (*Id*. at 63-64).  Plaintiff further testified that the woman had a medium height and build.  (*Id*. at 64).  At an earlier stage in this case, Plaintiff submitted that he "believe[d]" that the Disney representative was named Kathie Fong Yoneda.  (Doc. # 48 ¶ 28).  Plaintiff came across this name after searching the internet for websites "associated with PitchFests," one of which included an image of Ms. Yoneda.  (Doc. # 132-1 at 69).  At his deposition, Plaintiff answered in the affirmative a question regarding whether "the look of the photo [he] saw of [Ms. Yoneda] seemed vaguely familiar." (*Id.* at 70-71).  However, Ms. Yoneda submitted a declaration stating that she had not been an employee of Disney or any affiliated company since 1993 (Doc. # 39-2 ¶ 4), and Plaintiff stated in a declaration that he was "not certain that [Ms. Yoneda] was the woman with whom [he] met."  (Doc. # 28-1 ¶ 3).  Plaintiff testified that he left copies of the Works with the Disney representative as well as with representatives of other entertainment companies.  (*Id.* at 73-74).

In support of a separate theory of access, Plaintiff flags certain deposition testimony offered by Gill Champion of POW! Entertainment ("POW!").  (*See* Doc. # 156 at 7).  As discussed in more detail below, POW! is the entity which first pitched Disney on the idea of a superhero story based on the Chinese zodiac.  (*See* Doc. # 136-4 at 15-16).

Champion testified that it was POW!'s agent at Creative Artists Agency ("CAA") who first suggested the idea to Champion.[3]  (Doc. # 136-5 at 15).  According to Plaintiff, "[i]t is not unreasonable to infer that [the] agent had obtained a copy of [the Works]."  (Doc. # 154 at 7).

At the outset, the Court notes the general weaknesses of Plaintiff's access evidence.  Plaintiff does not identify the name or title of the Disney representative with whom he supposedly met at the Event.  Indeed, Plaintiff provides no information to identify the person beyond a vague physical description of her.   And Plaintiff provides no corroborating evidence that the woman he met was actually a Disney representative.  Although Plaintiff kept contemporaneous notes and records of his meetings at the Event (and the business cards of certain individuals he met there), these notes, records, and business cards do not substantiate any meeting with Disney or any of its affiliates.  (*See* Docs. # 132-4 and 132-5).  Moreover, Plaintiff provides no evidence that POW!'s CAA agent even attended the Event or had access to the Works beyond mere speculation.

But even if Plaintiff *did* meet with a Disney representative at the Event and gave her a copy of the Works, this would still be legally insufficient to prove access.  As discussed above, federal appellate courts including the Sixth Circuit "have rejected bare corporate receipt as sufficient proof of access."  *Jones*, 558 F.3d at 493 (internal quotation marks omitted).  Indeed, courts typically require some proof of a nexus between the

---

[3]     Defendant redacted some references to Champion's deposition testimony it in the version of the Motion for Summary Judgment filed on the public docket.  (*See* Doc. # 130-1 at 8).  After Plaintiff raised his second theory of access in his Response (*see* Doc. # 154 at 7), however, Defendant filed its Reply which expressly references Champion's testimony without redactions. (*See* Doc. # 166 at 14-15).  Because Defendant has referenced Champion's testimony on the public docket, the Court shall do the same—but only to the extent necessary to address Plaintiff's second theory of access.

recipients of a work and the alleged infringers for access to be a triable issue.  *Id.* (quoting *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 48 (2d Cir. 2003)).  Here, Plaintiff offers nothing beyond mere speculation that the supposed Disney representative he met with had any connection to the creators of *The Zodiac Legacy*.  Even more speculative is Plaintiff's claim that the CAA agent somehow had access to the Works and transmitted them to *The Zodiac Legacy*'s creators.  In the absence of any other evidence of access, the Court concludes that Plaintiff has failed to meet his burden on this issue.  *See Dean v. Burrows*, 732 F.Supp. 816, 827 (E.D. Tenn. 1989) (noting that a plaintiff alleging copyright infringement bears the burden of proving access).

Moreover, comparing the evidence of access in this case with that at issue in other Sixth Circuit cases provides additional support for the Court's access determination.  In *Jones v. Blige*, the plaintiffs' suit stemmed from a song that was recorded by a non-party artist managed by James E. White, one of the plaintiffs.  558 F.3d at 488.  After White "pitched" the song to Andy McKaie, Senior Vice President of Artists and Repertoire for Universal Music Enterprises, McKaie allegedly asked White to "send the product in."  *Id.* White then "hand-delivered a sealed package containing a demo CD [of the song]" to the building where McKaie's office was located.  *Id.* at 489.  White later spoke on the telephone with JoAnn Frederick, McKaie's secretary, who told White that the CD was still on McKaie's desk but that he would listen to it eventually.  *Id.*  White called Frederick again who "allegedly told him that their department had decided to pass on the CD."  *Id.* (internal quotation marks and bracketing omitted).  At White's request, Frederick returned the materials White had submitted but did not include the original envelope and cover letter, which demonstrated that the package containing the CD had been opened.  *Id.*

Later, White heard a song on the radio performed and written by defendants Mary J. Blige and Andre "Dr. Dre" Young which he believed infringed upon the song he submitted to Universal, the company which "publish[ed] Blige's records." *Id.*

In determining that this evidence was insufficient to prove access, the Sixth Circuit opined that—

> [the] [p]laintiffs in this case have set forth no evidence tending to show a reasonable probability that their work made its way from McKaie to the creators of [the allegedly infringing song]. There is no evidence that Blige, Young, or the other artists knew McKaie or worked with him, even indirectly. There is no evidence of the nature of Blige's and Young's relationships with Universal employees that would support an inference that McKaie transferred [the] [p]laintiffs' song to Blige or Young through other intermediaries at Universal. As far as the record shows, Blige and Young were affiliated with McKaie only through an attenuated corporate connection, and to find a reasonable possibility of access, a jury would be required to make an implausible leap, unsupported by evidence other than bare corporate receipt.

*Id.* at 493.

Here, Plaintiff's evidence of access is even more attenuated than in *Jones*. In *Jones*, the plaintiffs identified a particular and identifiable person who allegedly accessed their works and was an employee of the same company that published the allegedly infringing song. Plaintiff, on the other hand, can only claim that an unidentified individual who allegedly worked for Disney either directly or indirectly provided a copy of the Works to the creators of *The Zodiac Legacy*. And Plaintiff provides no evidence that POW!'s CAA agent ever had access to the Works in the first place, much less that the agent distributed them to *The Zodiac Legacy*'s creators.

Based on the above, the Court concludes that Plaintiff has failed to show legally sufficient evidence of access.

             **c.**    ***The Zodiac Legacy* is not substantially or strikingly similar to the Works to support an inference of copying**

Defendant next argues that the Works and *The Zodiac Legacy* are not substantially similar to one another to support an inference of copying.  (Doc. # 130-1 at 25-40).  "In the usual infringement case, access can be shown" and the plaintiff must submit evidence that the works at issue are "substantially similar" to one another.  *Murray Hill Publ'ns*, 361 F.3d at 317.  In this case, however, Plaintiff failed to present legally sufficient evidence of access.  "Where the plaintiff cannot prove access, the copyright infringement claim can still succeed, but only by proof of a higher level of similarity than the merely substantial."  *Id.*  In such cases, a plaintiff must show "striking similarity" between the works—that is, similarity which "preclude[s] the possibility of independent creation."  *Id.* (quoting *Glanzmann v. King*, No. 88-CV-70491-DT, 1988 WL 212507, at *1 (E.D. Mich. Aug. 29, 1988)).  Plaintiff has failed to meet this burden.  Indeed, Plaintiff's claim fails even under the less onerous substantial similarity criteria.

Courts in the Sixth Circuit "use a two-step approach to determine whether disputed works are substantially similar."  *Enchant Christmas Light Maze & Mkt. Ltd. v. Glowco, LLC*, 958 F.3d 532, 537 (6th Cir. 2020).  First, a court must filter "out the unoriginal, unprotectible elements—elements that were not independently created by the inventor, and that possess no minimal degree of creativity."  *Id.* (quoting *Kohus v. Mariol*, 328 F.3d 848, 855 (6th Cir. 2020)).  These unprotectible elements include: (i) ideas, "because copyright protection extends only to expression of ideas and not ideas themselves;" (ii) *scenes a faire*, "that is, incidents, characters[,] or settings which are as a practical matter indispensable, or at least standard, in the treatment of a given topic;" and (iii) any other

common or stock themes and usages.  *Brainard v. Vassar*, 625 F.Supp.2d 608, 617 (M.D. Tenn. 2009) (quoting *Stromback*, 384 F.3d at 294).

After filtering out any unprotectible elements, a court must evaluate whether the disputed works are substantially similar—that is, whether they are "so alike that the later (unprotected) work can fairly be regarded as appropriating the original expression of the earlier (protected) work."  *Glowco*, 958 F.3d at 539 (quoting *Coquico, Inc. v. Rodriguez-Miranda*, 562 F.3d 62, 68 (1st Cir. 2009)).  When making this evaluation, "it is appropriate [for a court] to examine the theme, characters, plot, sequence, pace, and setting for similarities."  *Stromback*, 384 F.3d at 297.  "However, random similarities scattered throughout the works may be discounted."  *Id.* (quoting *Murray Hill Publ'ns*, 361 F.3d at 320) (internal quotation marks omitted).  And any alleged similarities should be assessed "[a]t the level of actual expression[.]"  *Murray Hill Publ'ns*, 361 F.3d at 325.  As the Sixth Circuit has noted, federal appellate courts "have frequently affirmed summary judgment in favor of copyright defendants on the issue of substantial similarity" because the issue "can usually be decided on the basis of the works themselves and rarely, if ever, involves questions of credibility, the peculiar province of the jury."  *Id.* at 321.

Before addressing the alleged similarities between the works, the Court will generally describe them.  The Works comprise a 91-page screenplay and accompanying handwritten character biographies.  The screenplay opens on a Himalayan mountaintop during which Lee Chang, an "ancient . . . Asian man," and Steve Fin, "a 30 something carcasion disuple [sic] of the ancient one[,]" are having a conversation about the return of the "Scions of Chaos[.]"  (Doc. # 56-1 at 4).  Lee Chang is locked in an eternal battle with his cousin, Lin Ching, the leader of the Scions of Chaos.  (*Id.* at 26).  Lee Chang had

"banished [Lin Ching] . . . to a nether dimension for attempting to unleash chaos on earth." (*Id.* at 26).  But Lin Ching escaped banishment after his minions stole an object Lee Chang had hidden in the British Museum and used the object to open a portal to Earth.  (*Id.*).  As chaos spreads across the globe in the form of tsunamis, avalanches, tornados, and other natural disasters, as well as rising diplomatic tensions between Egypt and Israel, Lee Chang and Steven Fin relocate to their headquarters inside an old water tower.  (*Id.* at 7-9, 12-13).

Thereafter, Lee Chang recruits twelve children from countries across the world who are bestowed with superpowers aligned with the animal symbols of the Chinese zodiac.  (*Id.* at 20-24).  Prior to their recruitment, the children were each given an object which transferred to them their zodiac power.  (*Id.* at 21).  Plaintiff's dragon character, for example, received an invisible amulet from his grandfather.  (*Id.* at 17-18).  The children work together to defeat Lin Ching and his Scions of Chaos (who are adults) as well as avert a potential world war, and in the process travel to various locations around the world in a jet copter.  (*Id.* at 25-94).  The screenplay ends shortly after Steve Fin tells the children that "chaos has not been destroyed" and that he "already received an urgent request[ ] from the other side of the globe for another mission[.]"  (*Id.* at 93-94).

The character biographies provide brief descriptions of some of the characters that appear in the screenplay.  (*See* Doc. # 56-1 at 98-103).  For example, Plaintiff's character Tommy Hoto, Jr., codenamed "Dragon," is described as having a "palladrium [sic] skateboard [ ] he can mentally control" that is "indestructible" and as "a supreme martial artist" who is the "son of [a] strict Japanese American executive[.]"  (*Id.* at 98).  Plaintiff's horse character is described as having "the speed and endurance of a wild horse."  (*Id.*).

In contrast, *The Zodiac Legacy* is a trilogy of young adult novels spanning approximately 1,500 pages.  (*See* Doc. # 130-1 at 6).  In the Motion for Summary Judgment, Defendant offers the following plot summary (the accuracy of which Plaintiff does not dispute in his Response, *see* Doc. # 154):

> *Convergence*, the first *Zodiac Legacy* book, unfolds in four parts.  It opens with [the character] Maxwell unleashing the 12 zodiac powers from the ancient pools.  He absorbs six powers and transfers them to members of the Vanguard, his private army.  He and Jasmine[, another character], tussle over, and eventually split, the seventh and strongest power (Dragon). The remaining five powers, shooting out as beams of light, strike unsuspecting teenagers around the world.  The next quarter of the book covers Maxwell and Jasmine's globetrotting race to recruit the five Zodiac teenagers to their respective sides.  The third quarter recounts Jasmine's training of the Zodiac teenagers at her Greenland headquarters, Maxwell's unsuccessful kidnapping attempt, and the Zodiac teenagers' gradual development into a cohesive team.  The final quarter depicts Maxwell and Jasmine's battle over the Dragon power; the Zodiac teenagers save Jasmine and defeat Maxwell.
>
> After *Convergence* comes two more volumes.  *The Dragon's Return* describes the slow defection of Maxwell's Vanguard villains to the good side, as Maxwell fights to seize all of the zodiac powers for himself.  Maxwell ultimately takes the Dragon power for himself, while capturing and hiding away the powers held by others.  In *The Balance of Power*, the combined Zodiac/Vanguard team discovers that the Dragon is now using Maxwell as its human host as it seeks to destroy humanity and control the world.  The Dragon designs sophisticated technology to control plate tectonics and set off volcanic eruptions around the Ring of Fire, hoping to kill off a large percentage of the world's population.  The Zodiac/Vanguard team, led by Steven Lee, battles to regain their zodiac powers and defeat the Dragon. In the final fight, Maxwell and Jasmine sacrifice themselves to trap the Dragon power, and humanity is saved.

(Doc. # 130-1 at 37-38).

With the two works generally described, the Court will now assess whether they are substantially similar to one another.  This process begins with the filtering out of any unprotectible elements.  *See Glowco*, 958 F.3d at 537.  To begin with, Plaintiff concedes, and the Court agrees, that "[t]he simple *idea* of [z]odiac powered superheroes is not

protectible[.]"   (Doc. # 154 at 10) (emphasis original).   Moreover, as Plaintiff notes, the general concept of a team headquarters and the use of transportation technology is common to the superhero genre and is thus unprotectible.  (*See id.* at 12).   In addition to these conceded elements, the Court notes that various other common and stock themes are present in both works.   Both involve themes of saving the world, a battle of good versus evil (or order versus chaos), and familial issues, all of which are unprotectible at a general level.   *See Stromback*, 384 F.3d at 297.   Both works also feature the use of technology (and characters adept at technology), martial arts, and a recruitment process for heroes.   Such themes and tropes are commonly used in the superhero genre as evidenced by media depicting Batman and the X-Men, for example.

Additionally, both works involve characters whose superpowers are associated with their zodiac sign, such as Plaintiff's horse character having "the speed and endurance of a wild horse."  (*See* Doc. # 56-1 at 98).   Ideas "first expressed by nature[ ] are the common heritage of humankind, and no artist may use copyright law to prevent others from depicting them."   *Glowco*, 958 F.3d at 537-38.   Both works also depict younger heroes facing off against adult villains, which is a common device in the superhero and science fiction genre as evidenced by media properties such as *Teenage Mutant Ninja Turtles* and *Power Rangers*.  Both works involve a team of superheroes that were recruited from around the world, which is a common trope in the superhero genre as evidenced by *X-Men*.   Both works also reference historical rivalries between nations and contain cyclical elements, which are common as evidenced by *Captain America* and *Avatar: The Last Airbender*.  And finally, both works include characters with similar names (*e.g.*, Steve Fin and Lee Chang in the Works and Steven Lee in *The Zodiac Legacy*).   "A

name, however, generally is an unprotectible generic element of a work."  *Davis*, 2010 WL 2998476, at *10.  With these unprotectable elements filtered out, the Court will address the works' alleged substantial similarity.

As an initial matter, the Court notes that Plaintiff spends several pages of his Response detailing supposedly protected—but unique—aspects of the Works.  (*See* Doc. # 154 at 10-12).  For example, Plaintiff notes that one of his rooster character's superpowers is the ability to create "high tech gadgets quickly with scant materials[.]"  (*Id.* at 11).  Plaintiff makes similar assertions regarding some of his other characters' powers. (*See id.*).  Plaintiff also states that his "character[s'] powers are directly tied to the objects" they received, and that the protagonists' headquarters "is inside a water tower [ ] that magically transforms [into] a massive laboratory . . . magnitudes larger than the physical parameters outside could allow to possibly exist."  (*Id.* at 12).  However, as Defendant notes, these aspects of the Works are not present in *The Zodiac Legacy* (*see* Doc. # 166 at 22-24), and thus cannot support a finding of substantial similarity.

Before turning to specifics, Plaintiff generally contends that *The Zodiac Legacy* copies the Works in terms of "storyline and key expressive elements including character devices, plot, and story arc, cover to cover," and "also copies the more granular expression by use of the same writing style, including the lack of articles, and specific story details."  (Doc. # 154 at 13).  As support, Plaintiff attaches a 14-page spreadsheet which lists supposed similarities between the works at issue, some of which Plaintiff concedes "are generally not protectable expression."  (Doc. # 154-2; Doc. # 154 at 19 n.18).  The list notes both works include characters with similar national origins, reference Japan, Ancient Rome, and, supposedly, *Lord of the Rings*, include "banter," involve a

character disappointing his father, and include "minor curse words," to name a few.  (*See* Doc. # 154-2).

"[C]ourts have cautioned against considering lists of similarities between works to determine whether the works are substantially similar because such lists are inherently subjective and unreliable and tend to emphasize random similarities scattered throughout the works[.]"  *Davis*, 2010 WL 2998476, at *6 (internal quotation marks omitted).  Upon review, it appears that the list does just that.  And "random similarities . . . are not a proper basis for a finding of substantial similarity."  *Bridgeport Music, Inc. v. UMG Recordings, Inc.*, 585 F.3d 267, 275 (6th Cir. 2009) (quoting *Murray Hill*, 361 F.3d at 320).  Therefore, instead of focusing on Plaintiff's list, the Court will assess the supposed similarities Plaintiff raises in his Response.

According to Plaintiff, both the Works and *The Zodiac Legacy* "start and conclude in identical manners."  (Doc. # 154 at 13).  Specifically, Plaintiff contends that both works begin with a guided tour in a museum and end "with the good characters attempting to survive a cavern ceiling collapse."  (*Id.*).  However, this is not accurate.  Although *The Zodiac Legacy*'s opening scene takes place during a guided museum tour (*see* Doc. # 50 Exhibit C at 3-11), Plaintiff's screenplay begins with a scene set on a Himalayan mountaintop (*see* Doc. # 56-1 at 4-5).  And although both works contain early scenes set during a guided museum tour, the scenes are not substantially similar to one another at the level of actual expression.  Plaintiff's screenplay contains a scene in which a tour guide leads a group through the British Museum and by a display of rare stamps, while a "man in [a] trench coat smiles and moves carefully away from the group."  (Doc. # 56-1 at 5).  *The Zodiac Legacy*, on the other hand, opens on a scene set during a field trip to

a Chinese heritage museum in Hong Kong.  (Doc. # 50 Exhibit C at 3-11).  The cavern ceiling collapse scenes that Plaintiff identifies are also dissimilar.  Plaintiff's scene takes place toward the end of his screenplay and involves the zodiac children escaping the Great Sphinx of Giza as its ceiling collapses by "mov[ing] [certain] beams and obstacles." (Doc. # 56-1 at 92).  Defendant's scene takes place toward the end of the first book in the series and depicts characters escaping a collapsing cavern through an intact passageway on its ceiling.  (Doc. # 50 Exhibit C at 432-43).  Although these scenes share some similarities, they are distinct "[a]t the level of actual expression[.]"  *See Murray Hill Publ'ns*, 361 F.3d at 325.  Moreover, scenes depicting escapes from collapsing lairs are common in media, as evidenced by the *Indiana Jones* films.

Plaintiff points to one other alleged example of the works "contain[ing] the same scene[ ]."  (Doc. # 154 at 13-14).  Specifically, Plaintiff alleges that the works both contain scenes "where a driver attempts to scare his passenger as a joke by speeding in a Humvee and driving into an apparently solid wall, only to end up in team headquarters." (Doc. # 154 at 13-14).  Plaintiff's screenplay contains a scene in which Lee Chang, with Steve Fin as his passenger, drives a Humvee into a billboard causing Steve Fin to "close[ ] his eyes and scream[ ]."  (Doc. # 56-1 at 12).  After crashing through the billboard, Steve Fin opens his eyes and finds himself in the team's water tower headquarters.  (*Id.*).  *The Zodiac Legacy* depicts a scene in which Jasmine, with Steven Lee as her passenger, drives a Humvee across "the icy face of [a Greenland] plateau]" and toward a rock wall. (Doc. # 50 Exhibit C at 234-35).  Steven "grip[s] his seat in panic," but "[j]ust in time [ ] an opening appear[s] on the side of the rock . . . forming an entrance big enough to drive a

bus through." (*Id.* at 235).  Although the scenes share certain similarities, they are not substantially similar at the level of actual expression to create an inference of copying.

According to Plaintiff, both the Works and *The Zodiac Legacy* involve superhero teams "made up from teens from across the world," and that "multiple characters" from both works "came from the same countries."  (Doc. # 154 at 14).  Plaintiff also states that both works include "tension between characters from countries with historic battles" and "12 Zodiac characters in the 12th cycle of those characters."  (*Id.*).  As discussed above, the recruitment of a team of superheroes from around the world, references to historical rivalries, and cyclical themes are common in the superhero genre and are thus unprotectible.  Additionally, the overlapping character nationalities in the works ignores important differences at the level of expression.  For example, Plaintiff's ox character is a superhero from Austria.  (*See* Doc. # 130-2 at 2-3).  In contrast, Defendant's ox character is a supervillain from the United States.  (*See id.*).  Although both works involve female horse characters, Plaintiff's is a hero and Defendant's is a villain.  (*See id.* at 2).  And although Plaintiff alleges that both works have "Irish characters [that are] rowdy, poor, and tied to Northern Ireland" (Doc. # 154 at 14), the characters at issue do not share the same zodiac animal, superpower, or country of origin.  (*See* Doc. # 130-2 at 4).  The character similarities Plaintiff identifies are therefore either unprotectible, non-existent, random, and/or not present at the level of expression.

Relatedly, Plaintiff alleges that "the similarities between the characters [in both works] . . . are voluminous."  (Doc. # 154 at 15).  Specifically, Plaintiff alleges that:

> [b]oth [works] have Rooster characters with "sonic field" blasts; evil Snake characters with the power to hypnotize people; "techie" characters with unusual powers over computers; Ram characters with powers of being invulnerable; protagonists that are exceptional martial artists . . .; Rat

> characters that are traitors; wild boar imagery for their Pig characters; Horse characters that are super-fast and strong; and Ox characters that are super strong.

(*Id.* at 15).   As discussed above, characters adept at technology and martial arts are common in the superhero genre, and the general use of such characters is unprotectable. The powers of the animal characters that Plaintiff identifies are also unprotectable.   As evidenced by the Motion for Judicial Notice and its attachments (of which the Court has taken judicial notice), associating horses with speed and strength, oxen with strength, rats with traitorous behavior, and rams with invulnerability is culturally common.   (*See* Doc. # 131).   Associating snakes with evil is also common going back to the biblical story of Adam and Eve, and snakes' perceived ability to hypnotize their prey is commonly referenced in media such as *The Jungle Book* and *Aladdin*.   And assigning a rooster character a "sonic field" weapon is consistent with what Defendant notes is the animal's "most representative characteristic: its powerful 'cock-a-doodle-doo.'"   (*See* Doc. # 130-1 at 32); *see also Glowco*, 958 F.3d at 537-38 (ideas "first expressed by nature[ ] are the common heritage of humankind, and no artist may use copyright law to prevent others from depicting them.").   Finally, the use of wild boar imagery for pig characters is not surprising (or protectable) for obvious reasons.

Plaintiff next claims that "[t]he spirit of each story is conveyed through the expression[ ] of key repeated elements."   (Doc. # 154 at 15).   In support, Plaintiff states that both works include a "sage grandfather figure" who "transfer[s] power to the young Asian-American protagonist" through a talisman, and protagonists with distant relationships with their parents.   (Doc. # 154 at 15).   But the grandfather figures are only similar in the abstract, not at the level of actual expression.   Plaintiff's screenplay includes

a scene where the protagonist receives an invisible "amulet" from his grandfather which transfers the zodiac power to the protagonist.  (*See* Doc. # 56-1 at 17-18).  In *The Zodiac Legacy*, the grandfather figure appears in the protagonist's dream and gives him a compass which symbolizes his heritage.  (*See* Doc. # 50 Exhibit C at 100-103).  And to the extent the works involve generally similar familial issues, they are unprotectible.  *See Stromback*, 384 F.3d at 297.

According to Plaintiff, the "overall stories" of the works are similar.  (Doc. # 154 at 15-16).  In support, Plaintiff states as follows:

> In both [the Works] and *The Zodiac Legacy*, there is a similar recruiting process for international characters; water towers, laser beam and worldwide calamities are predominantly featured; magnetic forces causing "crustal displacement" is a device that appears in both works; a special team plane (both employ specifically a "jetcopter" with bottom rotors and "stealth mode") and team headquarters; round disc talismans are used to draw the Zodiac powers; good characters fight an evil team that also has powers of each of the 12 animals in the Chinese Zodiac; both invoke the idea of chaos vs. order; the "evil" team is older, more experienced, and deadly; military and mercenary imagery is used extensively; defense contractors appear in both; "pools" and "caves" are featured prominently; teleportation is used as a device; high tech gadgets as well as super powers are used; and, finally, there is an allusion to heritage and the ancient backstory of the Zodiac power.

(*Id.*).  These alleged similarities are either unprotectible, non-existent, random, or not present at the level of expression.  As stated above, themes and devices such as a recruiting process for heroes, an international team of heroes, the use of a team headquarters, a battle between good and evil (or between order and chaos), younger heroes battling older villains, the use of technology (including transportation technology), and the use of superpowers are common to the superhero genre and are unprotectible. Moreover, Plaintiff only identifies what appears to be random similarities between the works when he notes that they both feature water towers, laser beams, "worldwide

calamities," magnetic forces, round disc talismans, military imagery, a defense contractor character, pools and caves, and teleportation.  For example, although both works feature water towers, they do so in completely different ways.  In Plaintiff's screenplay, the hero team's headquarters is in a water tower.  (*See* Doc. # 56-1 at 21-22).  In contrast, *The Zodiac Legacy* includes a scene where a water tower almost crashes down on a school.  (*See* Doc. # 50 Exhibit D at 12-15).  And references to "heritage" and the "ancient backstory of the Zodiac power" are too abstract to be protectible.  See *Brainard*, 625 F.Supp.2d at 617 (copyright protection does not extend to mere ideas); *see also Murray Hill Publ'ns*, 361 F.3d at 325 (substantial similarity is to be assessed "[a]t the level of actual expression[.]").

Toward the end of the Response, Plaintiff identifies apparent similarities between the Works and *The Zodiac Legacy* which, according to Plaintiff, show that they are strikingly similar to one another.  (*See* Doc. # 154 at 16-18).  For the most part, the Court already addressed these alleged similarities above, finding them to be either unprotectible, non-existent, random, and/or not present at the level of expression, and therefore insufficient to show substantial similarity.  The Court will not rehash its prior findings on these alleged similarities while assessing striking similarity, which requires more proof.  Instead, the Court will only address the two alleged similarities that the Court has not yet addressed.

First, Plaintiff notes that his screenplay and POW!'s initial pitch both featured a rabbit character who is wheelchair-bound.  (Doc. # 154 at 17).  According to Plaintiff, his decision to make his rabbit character wheelchair-bound was "counterintuitive" as other media properties, such as the *Jackie Chan Adventures* series, often assign rabbits the

power of super speed.  (*Id.*).  Plaintiff implies that the fact his screenplay and the initial pitch both featured an unusual rabbit character cannot be a mere coincidence.  (*See id.* at 16).  However, the issue is whether the Works are strikingly similar to *The Zodiac Legacy*, and not POW!'s initial pitch.  Plaintiff does not contest that *The Zodiac Legacy*'s rabbit character is not wheelchair-bound.  Moreover, the Sixth Circuit has noted that "[c]onsideration of earlier versions of [a work] is too unreliable in determining substantial similarity."  *Stromback*, 384 F.3d at 299.

Second, Plaintiff notes that another early "treatment" of Defendant's story described the first book as "focus[ing] on Steve's struggle to find the other Zodiac kids[.]" (Doc. # 134 at 17; *see also* Doc. # 136-11 at 2).  According to Plaintiff, "Zodiac Kids" was the working title of his screenplay.  (Doc. # 134 at 17).  Plaintiff appears to imply that this reference to "Zodiac kids" in the initial treatment could not have been coincidental.  The Court disagrees.  It is explainable (and obvious) how two individuals might, independent of one another, use the phrase "zodiac kids" to refer to a group of child characters with zodiac powers.  Moreover, the deposit copy of the screenplay is entitled "Zodiac Regiment Twelve," not "Zodiac Kids."  (*See* Doc. # 56-1).  Plaintiff offers nothing beyond speculation that the creators of *The Zodiac Legacy* knew about his working title or otherwise appropriated it.

All in all, the similarities between the Works and *The Zodiac Legacy* Plaintiff identifies are either unprotectible, non-existent, random, and/or not present at the level of expression.  Based on the above, the Court concludes that Plaintiff has failed to show substantial similarity and, therefore, necessarily failed to show striking similarity.  Having already concluded that Plaintiff failed to show legally sufficient evidence of access, the

Court concludes that Plaintiff has failed to show adequate evidence of copying, entitling Defendant to summary judgment.  The Motion for Summary Judgment (Doc. # 130) is accordingly **granted**.

### d. Plaintiff fails to overcome Defendant's evidence of independent creation

Even if Plaintiff could show sufficient evidence of copying, the fact remains that Defendant has proffered extensive evidence of independent creation.  "Under Sixth Circuit authority, [a] presumption of copying may be unequivocally rebutted by showing evidence of 'independent creation' of the allegedly infringing work." *Jones v. Blige*, No. 04-60184, 2006 WL 3343741, at *7 (E.D. Mich. Nov. 17, 2006) (citing *Fogerty v. MGM Group Holdings Corp.*, 379 F.3d 348, 352 (6th Cir. 2004)).  The Court summarizes Defendant's evidence of independent creation as follows.

In 2001, Stan Lee—the creator of famous comic book characters such as Spider Man, the X-Men, and the Incredible Hulk—formed POW! alongside Arthur Lieberman and Gill Champion.  (Doc. # 136-5 at 5).  The principals formed POW! to license Lee's new superhero stories and characters to third parties who would develop them into films, books, and other media.  (Doc. # 136-4 at 3-4).  The "creative personnel" at POW! during the relevant period consisted of Lee, Champion, and Steve Voccola.  (Doc. # 136-5 at 7). Kim Luperi was also a POW! employee.  (*See* Doc. # 136-4).

During her deposition, Luperi answered in the affirmative a question about whether POW! was "focused on developing works for international audiences . . . in [its] first couple [of] years."  (Doc. # 136-4 at 5).  By 2011, POW! was making efforts to tap into international audiences by developing superhero franchises based on Indian and Chinese mythology.  (*See* Doc. # 136-5 at 7-13).  Voccola testified that it was around this time

when he started to develop superheroes based on the Chinese zodiac.  (Doc. # 136-3 at 12-18).  He also testified that he came up with the name "Steven Lee" for the protagonist by combining his first name with Lee's surname.  (*Id.* at 27-28).  Voccola eventually wrote a "treatment" for a film project given the working title *The Zodiac*.  (*See id.* at 23).  The treatment outlines the character and concept of a film in which Steven Lee and the other heroes are recruited across time and space and face off against a group of adversaries known as the Organization.  (*See* Doc. # 136-20).  Voccola testified that no one outside of POW! gave him input during *The Zodiac*'s development process.  (Doc. # 136-3 at 24).

Luperi testified that in February 2012 she sent *The Zodiac* to Amy Wollman, an attorney in Disney's legal affairs department.  (Doc. # 136-4 at 15-16; *see also* Doc. # 136-5 at 79-80).  Wollman circulated the treatment to Rich Thomas, one of Defendant's book editors, who asked Nachie Marsham, another editor on Thomas's team, to evaluate the treatment as a potential book project.  (*See* Doc. # 136-2 at 3-4).  Marsham testified that the "main appeal for [*The Zodiac*] being a new property for Disney Publishing was that Stan Lee, [the] legendary comics creator, was bringing a story that felt like the materials his legacy was built on[.]"  (Doc. # 136-2 at 8).

Using Voccola's treatment as a starting point, Marsham developed a proposal for a three-volume series of illustrated novels.  (*See* Doc. # 136-11).  During his deposition, Marhsam answered in the affirmative questions as to whether it was his "idea to focus the first book of *The Zodiac Legacy Trilogy* on the struggle to find the other zodiac kids[,] . . . to focus the second book . . . on the dangers of the zodiac powers themselves[, and] . . . to focus the third book on the battle against the zodiac powers[.]"  (Doc. # 136-2 at 22-23).  Marsham conducted "research predominantly online to familiarize [himself] a little bit

better with the mythology and the kind of base legends behind the animals of the Chinese zodiac." (*Id.* at 22).  Marsham kept Steven Lee as the protagonist and decided to make him a teenager, noting that the books "were going to be for younger readers[.]" (*Id.* at 23).  Marsham testified that he used both "real world and fantastical" sources of inspiration when deciding which superpower to assign each character.  (*Id.* at 31).  For example, Marsham decided to give his snake character the ability to "hypnotize its prey" based on his viewing of "nature documentar[ies]" as well as "the kind of cartoonish-like snake hypnosis that you see in some old Disney cartoons like *Aladdin*[.]" (*Id.*).  Marsham testified that he used "[t]he general structure of having the . . . younger characters . . . on the run from [the] older, authoritarian characters" because it "play[ed] well" with how young audiences sometimes "see the world when [they] are 8 to 12 years old." (*Id.* at 32-33).

Marsham testified that he hired Andie Tong, a comic book illustrator, to provide concept illustrations for *The Zodiac Legacy*, and Stuart Moore, an independent contractor, to write the book trilogy.  (*Id.* at 9-10; *see also* Doc. # 136-1 at 14-15).  Marsham had worked with Tong and Moore on prior projects.  (Doc. # 136-2 at 9-10).  According to Marsham, Moore was tasked with turning "the very small" amount of material Marsham had provided "into a full manuscript[.]" (*Id.* at 16).  At his deposition, Marsham answered in the affirmative questions as to whether Moore "had [the] principal responsibility for developing the story line" and "character art of the characters within *The Zodiac Legacy* [series]." (*Id.*).

At his deposition, Moore testified that he wrote all the books in *The Zodiac Legacy* series.  (Doc. # 136-1 at 18).  According to Moore, the "biggest influence" on *The Zodiac*

*Legacy* was Stan Lee's own *X-Men*, in particular the "idea of people with extraordinary powers popping up in different parts of the globe and being recruited by either the good guys or the bad guys[.]"  (*Id.* at 21).  Moore also testified that he "had no direct contact" with Lee or anyone else at POW! while writing *The Zodiac Legacy*.  (*Id.* at 16).  Moore researched the background of the zodiac signs so that he could "flesh out, and in some cases, suggest the personalities of the various characters" as well as "visual motifs that might be useful in the course of the book."  (*Id.* at 32).  Moore also testified that it was his idea to include Steven Lee's grandfather as a character in the series.  (*Id.* at 37-38).  Moore, Marsham, Voccola, Luperi, and Champion each testified that they had never seen or accessed the Works or heard of Plaintiff prior to this case.  (Doc. # 136-1 at 59-60; Doc. # 136-2 at 54-55; Doc. # 136-3 at 56; Doc. # 136-4 at 17-18; Doc. # 136-5 at 17).

Based on the above, the Court concludes that Defendant has provided "detailed and specific evidence of independent creation" to overcome any inference of copying.  *See Ellis*, 177 F.3d at 507.  According to Plaintiff, however, this evidence of independent creation is contradicted by statements Lee made in public interviews before his death in 2018.  (Doc. # 154 at 5).  The first interview concerned the publication of the second volume in *The Zodiac Legacy* series.  (*See* Doc. # 166 at 12).  When asked "[w]hat inspired [him] to continue with the series and creating these stories," Lee responded by stating: "Well, I was asked to do it by the people at Disney, and they said they'd even lavishly illustrate the book to make me feel comfortable with it."  (*Id.*).  In the second interview, Lee erroneously refers to the protagonist of *The Zodiac Legacy* as "Steven Tang."  (*See* Doc. # 154 at 5).  "Tang" is one of the characters in Plaintiff's screenplay.  (*See id.*).

Upon review, the Court concludes that Lee's statements do not contradict Defendant's extensive evidence of independent creation.  In the first interview, Lee merely offers what Defendant characterizes as a "humorous[ ] discuss[ion]" of the second book's publication.  (*See* Doc. # 166 at 12).  As Defendant notes, Lee does not "describe [or address] how *The Zodiac Legacy* series was initially conceived and created."  (*Id.* at 12).  Moreover, Lee does not state or suggest that Disney appropriated the idea of *The Zodiac Legacy* from Plaintiff.  Although a court on summary judgment must draw all reasonable inferences in favor of the nonmoving party, *Matsushita Elec. Indus. Co.*, 475 U.S. at 587, "summary judgment does not allow, much less require that [a court] draw strained and unreasonable inferences in favor of the nonmovant," *Fox v. Amazon.com, Inc.*, 930 F.3d 415, 425 (6th Cir. 2019) (quoting *Audi AG v. D'Amato*, 469 F.3d 534, 545 (6th Cir. 2006)) (internal quotation marks omitted).  Moreover, Lee's statement in the first interview is hearsay which is not subject to any apparent hearsay exception.  *See* Fed. R. Evid. 801, 803-804, and 807.  And "[h]earsay evidence may not be considered on summary judgment."  *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 927 (6th Cir. 1999).  As to the second interview, Lee's mistaken reference to Steven "Tang" appears to be the kind of "stray piece[ ] of circumstantial evidence cast[ing] doubt" on other evidence that the Sixth Circuit has declined to credit on summary judgment.  *See Fox*, 930 F.3d at 425.

Based on the above, the Court concludes that Defendant's evidence of independent creation also entitles Defendant to summary judgment.

### 3.     Motion to Exclude

Defendant requests that the Court exclude the opinions of Plaintiff's damages expert, Cedar Boschan, pursuant to Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).  (Doc. # 129 at 1).  Defendant specifically argues that Ms. Boschan's expert testimony is "irrelevant, unreliable, and unhelpful."  (Doc. # 129-1 at 6).  Having already determined that Defendant is entitled to summary judgment on Plaintiff's sole claim of copyright infringement, however, the Court need not address these arguments.  Instead, the Motion to Exclude (Doc. # 129) is **denied as moot**.

### 4.     Motions to Continue Under Seal

Defendant requests that the Court maintain under seal certain redacted portions of briefs and exhibits that were filed on the public docket.  (Docs. # 142, 153, and 161).  Defendant submits that the redactions concern confidential matters such as costs and revenues connected with *The Zodiac Legacy*, terms and information in agreements with nonparties, and other related information.  (*See id.*).

A "party seeking to seal records has the heavy burden of overcoming the strong presumption in favor of openness."  *Kondash v. Kia Motors Am., Inc.*, 767 F. App'x 635, 637 (6th Cir. 2019) (quoting *Shane Grp., Inc. v. Blue Cross Blue Shield*, 825 F.3d 299, 305 (6th Cir. 2016)) (internal quotation marks omitted).  "To meet this burden, the party must show three things: (1) a compelling interest in sealing the records; (2) that the interest in sealing outweighs the public's interest in accessing the records; and (3) that the request is narrowly tailored."  *Id.*  The privacy interests of third parties "weigh heavily in a court's balancing equation."  *Shane Grp., Inc.*, 825 F.3d at 308.  The public has a

recognized interest in "ascertaining what evidence and records [courts] have relied upon in reaching . . . decisions," *id.* at 305, and in case information involving subject matters such as "discrimination, voting rights, antitrust issues, government regulation, [and] bankruptcy," *Lipman v. Budish*, 974 F.3d 726, 753 (6th Cir. 2020).  Courts routinely seal records "when interests of privacy outweigh the public's right to know."  *In re Knoxville News-Sentinel Co., Inc.*, 723 F.2d 470, 474 (6th Cir. 1983).

As an initial matter, the Court notes that Plaintiff did not respond to the Motions to Continue Under Seal.  In the absence of any opposition from Plaintiff (or otherwise), the Court concludes that it need not specifically address the Motions on the merits.  *See* L.R. 7.1(c) ("Failure to timely respond to a motion may be grounds for granting the motion.").  That said, the Court briefly addresses the Motions' merits as follows.  Upon review, it appears that the redacted portions of the briefs and exhibits relate to Defendant's and/or nonparties' confidential information—the latter of which deserves special protection.  *See Shane Grp., Inc.*, 825 F.3d at 305.  Additionally, the Court did not rely on the redacted information to resolve any issues in this case, which does not involve the special subject matters listed above.  Thus, the interests of privacy appear to outweigh any apparent public interest in the redacted information.  Moreover, it appears that Defendant narrowly tailored the redactions to protect specific confidential information.  Based on the above, the Motions to Continue Under Seal (Docs. # 142, 153, and 161) are each **granted**.

III.   **CONCLUSION**

Accordingly, **IT IS ORDERED** that:

(1)    The Motion of Defendant Buena Vista Books, Inc. for Summary Judgment (Doc. # 130) is **GRANTED**;

(2)     The Request for Judicial Notice in Support of Motion of Defendant Buena Vista Books, Inc. for Summary Judgment (Doc. # 131) is **GRANTED**

(3)     This matter is **STRICKEN** from the Court's docket;

(4)     A **Judgment** in favor of **Defendant Buena Vista Books, Inc.** will be entered contemporaneously herewith;

(5)     The Motion of Defendant Buena Vista Books, Inc. to Exclude Testimony of Proffered Expert Cedar Boschan (Doc. # 129) is **DENIED AS MOOT**; and

(6)     The Motions of Defendant Buena Vista Books, Inc. to Continue Under Seal Certain Documents (Docs. # 142, 153, and 161) are **GRANTED**.

This 19th day of January, 2024.

**Signed By:**

*David L. Bunning*

**United States District Judge**

K:\DATA\ORDERS\Cov2018\18-205 MOO re MSJ and Misc Mtns.docx